# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CT-01232-SCT

*JOSEPH RONALD HARTFIELD a/k/a RONALD*
*"DREW" HARTFIELD*


*v.*

*STATE OF MISSISSIPPI*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 07/11/2012 |
| TRIAL JUDGE: | HON. MICHAEL R. EUBANKS |
| TRIAL COURT ATTORNEYS: | ROBERT WHITACRE |
| | DOUGLASS E. MILLER |
| | LAUREN B. HARLESS |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ROBERT GREER WHITACRE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: STEPHANIE BRELAND WOOD |
| DISTRICT ATTORNEY: | HALDON J. KITTRELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE LAMAR COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED - 03/05/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CHANDLER, JUSTICE, FOR THE COURT:**

¶1. A jury convicted Ronald Hartfield of conspiracy to murder his wife but acquitted him

of her murder. The Circuit Court of Lamar County sentenced Hartfield to twenty years in the

custody of the Mississippi Department of Corrections. Hartfield appealed, and this Court

assigned the case to the Court of Appeals. The Court of Appeals reversed and remanded for a new trial based on the trial court's exclusion of a coconspirator's letters offered as statements against her penal interest under Mississippi Rule of Evidence 804(b)(3). This Court granted the State's petition for certiorari to address that issue.

¶2. We find that the letters were not against the coconspirator's penal interest and that they were properly excluded by the trial court. Because the Court of Appeals did not address Hartfield's arguments on the weight and sufficiency of the evidence and the trial court's denial of one of Hartfield's peremptory challenges, we rule on those issues. We find that the trial court's denial of the peremptory challenge was not clearly erroneous. We further find that the evidence was sufficient to support Hartfield's guilt of conspiracy, and that the verdict of guilt was not against the overwhelming weight of the evidence. Therefore, we reverse the judgment of the Court of Appeals and reinstate and affirm the judgment of the Circuit Court of Lamar County.

**FACTS**

¶3. Tabitha Hartfield was murdered on the night of May 24, 2008. That night, Hartfield, Tabitha, Tabitha's cousin Natasha Graham, and Cody Dixon were at Graham's residence, a trailer located in rural Lamar County. After an argument with Hartfield, Tabitha tried to leave in Hartfield's car, but she wrecked the car in a pond dam on the property. Tabitha got out of the car and wandered down the driveway while Hartfield and Dixon tried, unsuccessfully, to dislodge the car from the pond dam. Hartfield, Graham, and Dixon each gave conflicting stories as to what happened next. Hartfield said that when he realized the car was stuck, he went inside and fell asleep. He denied any involvement in the murder and

2

stated that he first learned Tabitha was dead after Graham reported the murder to police on May 31, 2008. But Hartfield's cellmate, Joseph Bryant, testified that Hartfield told him that Hartfield and his girlfriend had discussed killing his wife, and then they strangled her with a dog leash and buried her in the woods.

¶4.     Dixon testified that Graham and Tabitha had fought earlier that evening due to Tabitha's suspicion that Graham was having an affair with Hartfield. He testified that, after Tabitha wrecked the car, Graham crushed some pills, mixed them in a glass of water, and brought the glass to Tabitha, who drank the mixture. Then, he and Hartfield walked over to Tabitha, and Hartfield strangled her with a dog leash. Dixon testified that Tabitha was too intoxicated to resist. Dixon testified that, while Hartfield was strangling Tabitha, a vehicle approached, and he and Hartfield hid and left Tabitha lying in the driveway. Jeremy Gibson was driving the vehicle. Dixon said that, when Gibson saw Tabitha, he honked and then turned around and left, but quickly returned and drove to the trailer, where he spoke briefly with Graham before departing. After a few minutes, Dixon and Hartfield returned to Tabitha, and Hartfield strangled Tabitha to death with the leash. Dixon testified that Graham came out, cut Tabitha's wrists with a kitchen knife, and helped wrap her body in a blanket. The three put Tabitha's body on a trailer attached to a lawn mower and, the next morning, Dixon and Graham drove the lawn mower into the woods and buried the body in a shallow grave. Dixon testified that Hartfield instructed him to "take the blame" if the police got involved.

¶5.     Gibson testified that, as he drove down the driveway, he observed Tabitha lying in the road, honked, and yelled at her to move. Tabitha sat up and looked at him, then lay back down. Gibson testified that, initially, he drove away after seeing Tabitha because he did not

3

get along with her husband, Hartfield, but then he changed his mind and drove back to the trailer. This time, Tabitha did not move when he honked, and he drove around her. Gibson stated that, through the trailer's window, he saw Hartfield sitting at the kitchen table. Gibson also testified that he saw Dixon pop his head out of a window. Gibson testified that Graham walked outside, and he told her he wanted pills; she replied that it was not a good time. Then, Hartfield came outside, and Gibson left.

¶6.     Dixon admitted that his testimony was the result of a favorable plea bargain. He also admitted that his trial testimony differed from his earlier statements to the police. On May 31, 2008, Dixon told the police that he had strangled Tabitha, and that, at the time of the murder, Hartfield had been asleep inside and had no knowledge of Tabitha's murder. After that statement, Dixon wrote several letters to investigators offering to assist with the State's case in exchange for a favorable plea deal. Finally, on June 2, 2011, Dixon told the police that Hartfield had killed Tabitha. But in an August 29, 2011, letter to investigators, Dixon admitted that he had falsely implicated Hartfield to save himself. Dixon denied that he had written that letter.

¶7.     Graham reported the murder to the authorities on May 31, 2008. She told a 911 operator that she had killed her cousin. Officer Jason Alexander responded to the call, and Graham led him to the gravesite. Alexander arrested Graham and asked Officer Matt Henderson to drive her to the jail. Henderson testified that, during the trip to the jail, Graham stated that "Dixon was there and he helped. And Mr. Hartfield was there, but in the house . . . Hartfield was at the house, but not near where the murder occurred." At the jail, Graham told Chief Investigator Richard Cox that a blue dog leash had been used to strangle Tabitha.

4

Investigator Cox found two blue dog leashes inside Graham's trailer.

¶8. Graham was convicted in a separate trial of murder and conspiracy to commit murder. Graham took the stand at Hartfield's trial but invoked her rights under the Fifth Amendment of the United States Constitution due to her prior conviction and pending appeal. This Court subsequently affirmed Graham's conviction. *Graham v. State*, 120 So. 3d 382, 389 (Miss. 2013).

¶9. Hartfield sought to introduce several letters Graham had written while awaiting trial to Hartfield, her boyfriend James Decker, and her mother, Diane Breakfield. In the letters, Graham stated that Dixon, acting on his own, had strangled Tabitha while Hartfield was inside asleep, and that Dixon had forced Graham to assist him with disposing of the body. Hartfield argued that these letters were admissible under Mississippi Rule of Evidence 804(b)(3). Mississippi Rule of Evidence 804(b)(3) contains an exception to the hearsay rule providing that, if the declarant is unavailable as a witness, a statement against the declarant's penal interest that exculpates the defendant is admissible if corroborating circumstances clearly indicate the statement's trustworthiness. M.R.E. 804(b)(3). The trial court agreed that Graham was unavailable and that the letters were against her penal interest but excluded the letters on the ground that they were uncorroborated and lacked indicia of trustworthiness. The Court of Appeals reversed and remanded for a new trial, finding that Graham's statements in the letters were against her penal interest and sufficiently corroborated by the police statements given by Hartfield and Dixon, the autopsy findings, and other evidence. This Court granted the State's petition for certiorari. Because we find that Graham's statements were not against her penal interest, we do not reach the issue of whether

5

corroborating circumstances indicated the statements were trustworthy.

## DISCUSSION

I. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY EXCLUDING GRAHAM'S LETTERS.

¶10. This Court reviews the trial court's ruling admitting or excluding evidence for abuse of discretion. *Whitaker v. State*, 146 So. 3d 333, 337 (Miss. 2014). Additionally, an evidentiary ruling will not be disturbed unless the error affected a substantial right of a party. M.R.E. 103(a).

¶11. It is undisputed that Graham's letters to Hartfield, Decker, and Breakfield constituted hearsay. Under Mississippi Rule of Evidence 802, "[h]earsay is inadmissible except as provided by law." Rule 804 contains hearsay exceptions applicable when the declarant is unavailable as a witness. Rule 804(b)(3) states:

> *Statement Against Interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

M.R.E. 804(b)(3). The rule imposes three requirements for the admission of a statement that tends to expose the declarant to criminal liability and is offered to exculpate the accused: (1) that the declarant is unavailable as a witness, (2) that the statement so far tends to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement. *Id.* Such declarations against penal interest are

6

admissible on the theory that they are reliable, because "[n]o reasonable person would make such a statement and invite possible criminal prosecution if the statement were not true." M.R.E. 804(b)(3) cmt.

¶12.   Certainly, the first requirement for admissibility was fulfilled because Graham, having invoked her rights under the Fifth Amendment, was unavailable as a witness. *See **Lacy v. State***, 700 So. 2d 602, 603, 608 (Miss. 1997). The dispute at trial and at the Court of Appeals centered on whether the statements were against Graham's penal interest and, if so, whether sufficient corroborating evidence indicated their trustworthiness. The Court of Appeals held that the letters were against Graham's penal interest, stating that the letters were "so contrary to Graham's pecuniary interest and subjected her to criminal liability, such that she would not have made the statement unless she believed it to be true." The State argues that, because in the letters, Graham asserted that she had participated in the crime under duress, the letters were not against her penal interest. To clarify our analysis of whether Graham's statements were against her penal interest, we quote Graham's letters to Decker and Hartfield, italicizing the portions in which she described her involvement in Tabitha's death:

*A. Graham's letter to Decker dated July 2008*

I'll tell you what happened that nite—everything—but its really hard on me—so there's probably going to be a lot more dry tears on this paper than there already is. Tabitha & her husband Ronald came over that day. (She's my cousin—I loved her—she was a blast!) We were drinking vodka and beer together. She wanted to know if we wanted to ride to Collins with them to go pick up her birthday present. So we did. On the way back to the house she had drank way too much and her and Ronald got into it. She was hitting him and jerking the steering wheel while he was driving and she almost wrecked us a couple of times. I tried to stop her by putting my arms around her from the back seat to pin her down while I was talking to her but she almost bit my thumb into! She turned around and started hitting me & Cody. I dove over the

7

seat at her & crammed her into the floor board. I told her I'd let her up if she promised to behave until they dropped me off. She said ok so I let her up. She did good and when we got to my house she and me talked & hugged. She said she was sorry for showing her ass and all. I told her it was okay that I wasn't mad at her. Well, she wanted to go home & her husband didn't so she jumped in their car and started down the driveway without him and she wrecked on the pond dam. She jumped out of the car and ran up the driveway a little ways and sat on the side in the bushes. Ronald & Cody tried to get the car out but couldn't. They went in the house and pulled out a bottle of tequila & started doing shots. By this time b/c of all the drama I was sober. I hadn't drank nothing since the Fite in the car. I went up the road and was trying to talk Tabby into coming in the house. She wouldn't. I told her she could stay in the room with me but she still wouldn't. I tryed talking to her for about 3 hours on and off. I brought her kool-aid and a sandwich thinking if she ate & sobered up some she'd come to her senses and come inside and it didn't work. So finally I told her if she wanted to be stubborn and sleep in the bushes & get ate up by mosquitoes then I'd let her. I told her I was going to bed and I went inside. It was about 1:00 a.m. and Cody & Ronald was still drinking. I told them I was gonna get a shower and go to bed & that Tabby wouldn't come in. Ronald said f[* *]k it let her stay out there. I told him they could sleep on the couch and get the car unstuck in the morning. I went to get a shower. When I got out I got in the bed. Cody came in and said he was gonna try to bring Tabby inside & that Ronald was on the couch asleep. I said ok but he'd probably have to carry her in once she passed out cuz she refuses to come in. Well he went outside and I layed down and drifted off. *About 30 mins. or a hour later Cody came back in the bedroom & woke me up. He was all excited and crazy looking Bouncing around the room. I was like "whats going on? Whats up w/ you?" Ya know. He started saying "I did it! I did it! I killed her!" I ran outside and saw Tabby laying face down in the driveway. I ran up to her and couldn't get her to wake up. I put my head on her back and there wasn't a heartbeat. I started freaking out! Cody was standing beside me with a kitchen knife in his hand. I was on my knees beside Tabby and I looked up at him and started crying and screaming "What did you do Cody? Why? Why did you do this?" He was smiling—his eyes almost glowing out of his head & was telling me how it excited him, it gave him a rush, it turned him on. My dog leash was laying beside her head. I went to get up on my feet and run and he dropped the knife in the dirt and grabbed the leash and caught me around the neck & by my hair. He brought me face to face and looked me in my eyes and told me I wasn't gonna to tell anybody and he was making sure of it. He said if I didn't do what he told me to he'd kill me and like it—the same way he did her . . . I was so scared Jamie. I've never been so scared in my life. I told him I'd do whatever he wanted just don't hurt my babies. Just don't take me from my kids and I'll do anything he said. He took the leash off my neck and I fell*

*down beside Tabby crying so hard I was gagging. I threw up twice in the bushes. He was laughing at me. He told me to help him turn her over so I did. He had a sheet from in the house and we put her on it. He told me to take the knife and cut her wrists so if somebody found her they would think she did it so I did. I helped him wrapp her in the sheet and put her in the wagon behind my lawn mower. He grabbed me and took me inside to the bedroom & told me to get in bed. So I did. I layed there crying with him sitting on the side of the bed wrapping & unwrapping the leash around his hand untill I cryed myself to sleep. About 6:30 he woke me up and told me to come with him. I went outside and me & him got on the lawn mower. He said I had to go with him cuz he wasn't leaving me alone & we went into the woods. About a mile & 1/2 back he stopped. He got off the mower and got the shovel. He made me help him get her body out of the wagon and drag her into the woods and lay her down. I sat behind her and cryed & cryed while he dug a hole. He wanted me to help him put her in it & cover it up but I couldn't. So he did it by his self.* Then we went home. Ronald woke up and left. He used my phone to get somebody to come get him. I called a friend to come get the boys for the week cuz I was scared what would happen. I tryed to do my everyday stuff but I couldn't and when I went to work at mom's or in the garden Cody stayed right under me. I couldn't even talk to mom and she kept asking what was wrong but I couldn't say nothing cuz Cody was there. I didn't sleep & when I did I had horrible nightmares. Cody kept the leash in the drawer beside the bed & kept threatening me—cornering me in the house & saying I need to toughen up cuz if anybody found out I'd be beside her in the woods. Finally after about 3 days my other friend Big Cody came over. I asked him would he stay a few days. He knew something was wrong too & kept asking me. Well Cody D. (my Cody—the one that did the sh[*]t) called me in the kitchen and grabbed me & was choking me & Big Cody caught him and got him off of me. Big Cody asked me what I wanted to do and I told him I was scared of Cody D and I wanted him to leave. Big Cody made him get in the car and me and Big Cody dropped him off at his momma's. That night I told Big Cody what happened. He stayed with me to make sure Cody D didn't come back and hurt me. My check came in that Friday (it was 5 days after the murder). Me & Big Cody went and paid my bills. I told him I was going to call the law and turn Cody D in. He took me out to dinner & tryed to talk me out of it but it didn't work. When we got to my house I went for a walk and called 911. I told them I was reporting a murder. When the cops got there I took them in the woods & showed them where he buried her. They arrested my & charged me with murder. It took 2 days (I think) to get Cody D. When they arrested him he wrote a statement saying he did it & that I didn't . . . .

(Emphasis added.)

*B. Graham's letter to Hartfield dated July 31, 2008*

Dear Ronald,

I've started this letter a thousand times in the last 2 months but my courage always fails me. I cant blame you if you don't even read this and just throw it away but I have to try.

Cody (Ethan Dixon) has ruined my life so I might as well take this chance to try to make things better for you, your son, and your daughter by letting you know the truth about what happened to Tabby that night. All of it that I know anyway. I don't know everything but I'll tell you the parts I do know. If I were in your shoes I think it would help my heart to know. So . . . .

First off let me say I love Tabby. She was my friend & family. I'd have NEVER hurt her. I hope you already know that. And I think the world of you too. I know ya'll had problems in your marriage but who doesn't! And its not fair that her family blames or accuses you for anything. She was at fault along w/ you when it comes to ya'lls problems. And what's between man & wife is none of anyone's business in the first place. Some things are meant to be private. Oh, and I've heard the rumors about you & me sleeping together & I don't care. Let them talk cuz you & I know the truth. I just hope & pray that all of them pay for their lies. And I hope & pray that no matter what happens to me Cody pays for what he's put all of our kids thru. He took Tabby away from ya'lls 2 and me away from my 3. So that's 5 kids who's lives will never be the same.

About what happened—I don't know all of it but here goes . . .

You had fallen asleep on the sofa and me & Cody had laid down. He got back up and said he was gonna try one last time to get Tabby inside cuz he didn't want her left outside like that. He got up and I halfway drifted to sleep. I'm not sure how long it was before he came back in but he seemed very excited. He said he wanted to show me something so I went outside with him. I got to the end of the pond dam and he pulled her out of the bushes. (God this is so hard Hartfield I am so sorry!) She was limp. I bent down on my knees beside her—Cody was saying how exciting it was to choke her. He still had the dog leash & he had a knife from my kitchen. I was scared and crying. Screaming at him saying what did you do! What did you do! You're crazy! I checked for a heartbeat, I put my head on her back trying to hear but she wasn't breathing. I got up and was saying I had to get my phone, I had to get help. *He put the leash back around her neck and squeezed making sure he did the job [and] showing off how he did it and how easy it would be to do it to me.* I thought

10

there was hope—maybe she was still alive but I was just panicing too bad to really know. *I turned around and Cody grabbed me by my hair and neck and swung me back down to the ground. He told me if I told anybody or said anything he'd kill me too. He forced me to look at her face and said that could be me as easy as it was her laying there. I didn't know what to do. He got a sheet and wrapped her up and made me help carry her. I'm so ashamed but I did what he told me to. Should have tried to fight him, tried to get inside to you but I was confused and scared and I didn't. And I was scared of you too! I was scared of what you'd do. I went in the woods with him b/c he wouldn't let me away from him and he buried her. I couldn't watch. I got sick and threw up. Over the next couple days he threatened me and wouldn't let me out of his sight—not even to use the bathroom!* I couldn't use the phone—that's why I didn't answer or call you back when you left that message. And thats why it took so long for me to call the police. My sister-in-law from Wiggins came that Wednesday and got the boys to safety for me and I started working on getting away from Cody. He was keeping the leash that he choked her with in the drawer beside my bed. He kept saying I'd better act normal or I'd disappear just like her. I was just like a zombie—scared not knowing what was really going on. Finally Cody Claburn came over & Cody Dixon put his hands on me & was threatening me in the kitchen. I screamed and Claburn came running in & got him and slapped him down. Me & Claburn took Dixon to his mom's and dropped him off. Finally I felt safe enough to tell someone. I had some drinks & smoked some weed & worked my nerve up. Then I called the cops. *I feel like I killed her b/c I couldn't do anything to stop it. Since I didn't wake you up or anything and I listened to Cody (out of fear) I may as well have done all of it myself.* I should've done something more—I should've risked my life to help her. I cant take that back. I have to live the rest of my life knowing that. I don't know what all else Cody did to her & I'm not sure I want to know. I'm still not sure I can deal with the things I do know. I cant blame you if you hate me & wish me dead. If I could I'd let you in this cell with me so you could beat me to death or punish me how you see fit—for not doing more & all. I'll never forgive myself for what has happened. And I don't expect you to. But I had to tell you—you deserve to know. I don't know whats going to happen to me but I hope whatever does happen someone will hear my story and use it to save someone else from this same pain.

(Emphasis added.)

¶13.   Graham also wrote two letters to her mother stating the following:

*C. Graham's letter to Breakfield, dated May 17, 2009*

It bothers me everyday that I could have kept my mouth shut & still been home

11

w/ my boys but that would've made me a horrible person to leave Tabitha's kids out in the cold always wondering if she left them & stuff. And it wouldn't have mattered what I said. Cody said to begin with if I told he'd make sure I went down with him. He wasn't lying & I knew what I was getting myself into from the start. I wish I would've told them the truth of how I knew instead of making it worse on myself w/ how I did the 911 call but fear/psychosis makes you do a lot of stupid things & blurs your foresite. I have to deal with that. I've accepted my situation . . . .

*D. Graham's letter to Breakfield, dated July 7, 2011*

. . . The DA still thinks I'm taking up for/covering up for Ronald which I AM NOT. If I knew he did something I'd tell it. So them thinking I'm lying or hiding something is really starting to piss me off. If it wasn't for me they'd never have a decent case to begin with. I've done nothing but be completely forth coming and cooperative & I'm just plain mad now.

¶14. Hartfield argues that the letters were against Graham's penal interest because she confessed to acting as an accessory after the fact. But the two letters that Graham wrote to her mother contained no admissions of criminal activity at all, so it is beyond question that those two letters were not against her penal interest and were inadmissible. Regarding the letters to Decker and Hartfield, Mississippi Code Section 97-1-5 provides that a person who knowingly aids or assists any felon with the intent to enable the felon to escape or avoid arrest, trial, conviction, or punishment after the commission of the felony, is an accessory after the fact. Miss. Code Ann. § 97-1-5 (Rev. 2014). Because Graham asserted that she had assisted Dixon with covering up the crime and disposing of the body after he had murdered Tabitha, Graham confessed to some elements of the crime of acting as an accessory after the fact. However, Graham consistently stated that she had assisted Dixon only because he had threatened to kill her unless she aided him. Therefore, she never confessed to the requisite intent for accessory after the fact. Moreover, Graham's confession indicated that all her

actions were taken under duress. We have held that "where a person reasonably believes that he is in danger of physical harm he may be excused for some conduct which ordinarily would be criminal." ***Banyard v. State***, 47 So. 3d 676, 681 (Miss. 2010) (quoting ***West v. State***, 725 So. 2d 872, 888 (Miss. 1998), *overruled on other grounds by* ***Jackson v. State***, 860 So. 2d 653 (Miss. 2003)). The defense of duress has four elements:

> (1) the defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; (2) that he had not recklessly or negligently placed himself in the situation; (3) that he had no reasonable legal alternative to violating the law; (4) that a direct causal relationship may be reasonably anticipated between the criminal action and the avoidance of harm.

***Banyard***, 47 So. 3d at 682 (quoting ***Ruffin v. State***, 992 So. 2d 1165, 1177 (Miss. 2008)). Graham's statements that she assisted Dixon because he threatened to kill her and she was in fear for her life attempted to assert the defense of duress.[1]

¶15.    We must determine whether Graham's confession that she aided Dixon in disposing of the body, but under duress, is a statement against penal interest under Rule 804(b)(3). To qualify, a statement need be "sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.'" ***Williams v. State***, 667 So. 2d 15, 19 (Miss. 1996), *overruled on other grounds by* ***Smith v. State***, 986 So. 2d 290, 298 n.4 (Miss. 2008) (quoting ***Williamson v. United States***, 512 U.S. 594, 603-04, 114 S. Ct. 2431, 129 L. Ed. 2d 476 (1994)). The

---

[1] We do not determine that Graham's statements established the elements of duress as a matter of law. Our holding is limited to an analysis of Graham's statements in the context of Rule 804(b)(3), which requires us to determine whether the statements so far tended to expose Graham to criminal liability that a reasonable person would not have made them unless she believed them to be true.

proponent is "required to show that the statement clearly and directly implicates the declarant himself in criminal conduct." *Williams*, 667 So. 2d at 19 (quoting *U.S. v. Sarmiento-Perez*, 633 F.2d 1092, 1101 (5th Cir. 1981)). A statement that serves, rather than prejudices, a defendant's interests does not qualify. *Ponthieux v. State*, 532 So. 2d 1239, 1246 (Miss. 1988). The determination of whether a statement is against the declarant's penal interest must be made by considering the statement in light of the surrounding circumstances. *Williamson*, 512 U.S. at 604.

¶16.    In Graham's letters to Decker and Hartfield, she blamed Dixon exclusively for the murder and asserted that all her actions were the result of duress. In *Bailey v. State*, 78 So. 3d 308, 318 (Miss. 2012), this Court held that a defendant's statement in which he confessed to having killed in self-defense was not a statement against his interest because the statement, if true, constituted Bailey's defense to criminal liability. The Court in *Bailey* relied on *Robinson v. State*, 758 So. 2d 480, 487 (Miss. Ct. App. 2000), in which the Court of Appeals held that a declarant's admission to acting in self-defense was not a statement against interest. *Bailey*, 78 So. 3d at 318; *see also* *United States v. Shyrock*, 342 F.3d 948, 981 (3d Cir. 2003) (holding that a statement that the declarant shot the victims in self-defense was exculpatory and not against the declarant's penal interest). As in *Bailey* and *Robinson*, Graham's statements, if true, asserted a defense to criminal liability. That the defense she asserted was duress rather than self-defense is of no analytical significance.

¶17.    Finally, regardless of whether Graham acknowledged participation in covering up a murder, she made those statements while incarcerated and awaiting her trial on murder and conspiracy charges. Her letters are nothing more than an attempt to exonerate herself from

14

her pending murder charge and place all blame on Dixon. The fact that she may also have implicated herself in a much lesser crime is of no consequence. In other words, a reasonable person in Graham's position would be furthering her interest by claiming that her participation was after the fact only. We have held that "post-arrest statements made by one accused pointing the finger at another are as a matter of common experience among the least trustworthy of statements . . . ." *Williams*, 667 So. 2d at 20. In sum, we cannot say that a reasonable person in Graham's position would not have made the statements unless believing them to be true. As such, Graham's statements were not against her penal interest, and they were not admissible under Rule 804(b)(3).[2]

## II. THE TRIAL COURT'S DENIAL OF ONE OF HARTFIELD'S PEREMPTORY CHALLENGES WAS NOT CLEARLY ERRONEOUS.

¶18.	Hartfield challenges the trial court's denial, under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), of his peremptory challenge to venire person number sixteen. During jury selection, Hartfield exercised seven successive peremptory challenges on white venire members. The State made a "reverse-*Batson*" challenge. *Batson* forbids the prosecution from racially discriminating through the use of peremptory challenges. *Batson*, 476 U.S. at 89, 106 S. Ct. 1712. This Court has held that neither the defense nor the prosecution is permitted to use peremptory strikes in a racially discriminatory

_____

[2] Because we find that the statements were not against Graham's penal interest and were properly excluded, we do not reach the issue of whether they were trustworthy. Although we find that the trial court did not abuse its discretion by excluding the statements, we note that the trial court erroneously relied upon evidence adduced at *Graham's separate trial* in its finding that the statements were not trustworthy. The trial court should have limited its inquiry to the record in *Hartfield's trial*.

manner. ***Hardison v. State***, 94 So. 3d 1092, 1097 (Miss. 2012). When the State challenges the defense's use of a peremptory challenges as racially discriminatory, this Court refers to it as a "reverse-***Batson***" challenge. ***Id.*** When a ***Batson*** challenge is made, the trial court employs a three-step process for determining whether a ***Batson*** violation has occurred.

> First, the party objecting to the peremptory strike of a potential juror must make a prima facie showing that race was the criterion for the strike. Second, upon such a showing, the burden shifts to the State to articulate a race-neutral reason for excluding that particular juror. Finally, after a race-neutral explanation has been offered by the prosecution, the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory strike, i.e., that the reason given was a pretext for discrimination.

***Pitchford v. State***, 45 So. 3d 216, 224 (Miss. 2010) (citing ***Flowers v. State***, 947 So. 2d 910, 917 (Miss. 2007)). Further, five indicia of pretext should be considered when analyzing a proffered race-neutral reason for a peremptory strike:

> (1) disparate treatment, that is, the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge; (2) the failure to voir dire as to the challenged characteristic cited; (3) the characteristic cited is unrelated to the facts of the case; (4) lack of record support for the stated reason; and (5) group-based traits.

***Pruitt v. State***, 986 So. 2d 940, 944 (Miss. 2008). "[T]he rule in ***Batson*** provides an opportunity to the [proponent of the strike] to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." ***Miller-El v. Dretke***, 545 U.S. 231, 251-52, 125 S. Ct. 2317, 2331, 162 L. Ed. 2d 196 (2005).

¶19. The State argued that a prima facie case of racial discrimination was made when Hartfield used his first seven peremptory strikes on white jurors, while accepting all African-

American jurors tendered. The trial judge found that this pattern constituted a prima facie case of purposeful discrimination, and Hartfield provided a race-neutral reason for each strike. Hartfield's counsel stated that he struck venire person number sixteen because he was asleep during defense counsel's voir dire. The judge stated that number sixteen had not been asleep. Defense counsel responded that "I watched him. He kept yawning and I would look and he wasn't firmly asleep, but the reason was when Mr. Whitacre was asking questions he would nod back and shut his eyes. And that was the reason." The prosecutors stated that they had not noticed number sixteen sleeping and that number sixteen had been responsive to questions, and argued that Hartfield's reason was pretextual. The trial court found that Hartfield's peremptory challenge to number sixteen was discriminatory but allowed his other six peremptory challenges. When defense counsel objected, the trial court noted that number sixteen had yawned a couple times and "did close his eyes, but he never was asleep."

¶20.    This Court will overturn a trial court's *Batson* ruling only if it was clearly erroneous or against the overwhelming weight of the evidence. *Batiste v. State*, 121 So. 3d 808, 848 (Miss. 2013). Because a *Batson* ruling is largely based on credibility, we give great deference to the trial court's decision. *Id.* Hartfield argues that a juror's appearing sleepy is a race-neutral reason for a strike. He argues that the trial court's finding of pretext was clearly erroneous because the trial court observed that number sixteen had yawned and closed his eyes; therefore, the trial court should have found the strike was not pretextual.

¶21.    Critically, Hartfield's race-neutral reason for the strike was not that number sixteen had been sleepy, but that number sixteen had been asleep. The trial judge observed that number sixteen had never been asleep, but that he had yawned a couple of times and closed

17

his eyes. Apparently, the judge found from his observation that number sixteen's demeanor did not justify the strike for the proffered race-neutral reason, and that the profferred race-neutral reason was a pretext for discrimination. The United States Supreme Court has stated

> Step three of the **Batson** inquiry involves an evaluation of the prosecutor's credibility, and "the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge." In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. We have recognized that these determinations of credibility and demeanor lie "'peculiarly within a trial judge's province,'" and we have stated that "in the absence of exceptional circumstances, we would defer to [the trial court]."

**Snyder v. Louisiana**, 552 U.S. 472, 477, 128 S. Ct. 1203, 1208, 170 L. Ed. 2d 175 (2008) (citations omitted). Here, the trial court evaluated the proffered race-neutral reason, that number sixteen had been asleep during voir dire, in light of the trial court's own observation, that number sixteen had not been sleeping, but had yawned and closed his eyes, and found that the race-neutral reason was pretextual. This determination rested entirely upon the trial court's firsthand observation of both defense counsel and number sixteen, and the trial court's conclusion that number sixteen's demeanor did not support the proffered race-neutral reason. Given that evaluations of credibility and demeanor are "peculiarly within a trial judge's province," we find that the trial court's finding of pretext was not clearly erroneous or against the overwhelming weight of the evidence.[3]

---

[3] In his dissent, Presiding Justice Dickinson would have this Court invade the trial judge's province by second-guessing the trial judge's observations of the juror and defense counsel. We refuse to expand our well-established scope of review.

18

III.    THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE VERDICT, AND THE VERDICT WAS NOT AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶22.    Hartfield argues that the evidence was insufficient to support the jury's verdict finding him guilty of conspiracy to commit murder. He also argues that the verdict was against the overwhelming weight of the evidence. He challenged the sufficiency and weight of the evidence by filing a motion for a judgment notwithstanding the verdict or a new trial, which was denied by the trial court.

¶23.    We begin by discussing the sufficiency argument. In a challenge to the sufficiency of the evidence, we determine "whether the evidence shows 'beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.'" *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005) (quoting *Carr v. State*, 208 So. 2d 886, 889 (Miss.1968)). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bush*, 895 So. 2d at 843 (quoting *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). If "the facts and inferences considered in a challenge to the sufficiency of the evidence 'point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty,'" then we will reverse and render. *Bush*, 895 So. 2d at 843 (quoting *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985)). But if reasonable, fair-minded jurors exercising impartial judgment could reach different conclusions on every element of the offense, then we will

19

affirm. ***Bush***, 895 So. 2d at 843 (citing ***Edwards***, 469 So. 2d at 70). We are mindful that the jury has the responsibility to resolve conflicts in the evidence and assess witness credibility, and it may accept in part or reject in part any witness's testimony. ***Brown v. State,*** 796 So. 2d 223, 227 (Miss. 2001).

¶24. According to Mississippi Code Section 97-1-1, [i]f two (2) or more persons conspire . . . [t]o commit a crime," they are guilty of conspiracy. This Court has stated that:

> We have defined the crime of conspiracy as follows: "Conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully, the persons agreeing in order to form the conspiracy. The offense is complete without showing an overt act in the furtherance of the conspiracy." The parties to the conspiracy must understand that "they are entering into a common plan and knowingly intend to further its common purpose." And finally, "the agreement need not be formal or express, but may be inferred from the circumstances, particularly by declarations, acts, and conduct of the alleged conspirators."

***Berry v. State***, 996 So. 2d 782, 787 (Miss. 2008) (quoting ***Farris v. State***, 764 So. 2d 411, 421 (Miss. 2000) (citations omitted)). The jury instruction on conspiracy instructed the jury to find Hartfield guilty of conspiracy if it found that Hartfield had conspired with either Graham, Dixon, or both, to murder Tabitha.

¶25. Hartfield argues that the evidence was insufficient that he entered into an agreement with anyone else to commit murder. He points out that the jury acquitted him of murder. He admits that Bryant testified that Hartfield had told him that he and Graham had talked about killing Tabitha, and then he killed her. But, he argues, "merely talking about a crime that later occurs" does not meet the elements of conspiracy. In other words, he contends that there was no evidence that Hartfield entered into a common plan to kill Tabitha and knowingly intended to further the plan's common purpose.

20

¶26.   Hartfield's argument ignores the fact that the agreement "need not be formal or express, but may be inferred from the circumstances." *Berry*, 996 So. 2d at 787 (quoting *Farris*, 764 So. 2d at 421). The declarations, acts, and conduct of the alleged conspirators may form the basis for the inference of an agreement. *Id.* Considering the evidence in the light most favorable to the verdict, sufficient evidence existed that Hartfield did more than merely talk about killing Tabitha, but entered into an agreement that Tabitha would be killed. A reasonable juror could infer that Hartfield and Graham had entered into an agreement to kill Tabitha from Bryant's testimony that Hartfield admitted that he and Graham had discussed killing Tabitha, and then it occurred. Gibson's testimony that he drove up to Graham's trailer during the course of the killing of Tabitha also supports Hartfield's guilt of conspiracy. Gibson testified that he saw Graham, Dixon, and Hartfield inside the trailer, and that Hartfield and Graham came outside. This evidence supports a reasonable inference that Hartfield knew that Dixon and/or Graham were killing Tabitha and that he agreed with them that she would be killed. Also, Dixon testified that Hartfield had killed Tabitha and had instructed him to take the blame. Although the jury rejected a murder conviction, Dixon's testimony supports a reasonable inference that Hartfield had entered into a common plan to kill Tabitha and knowingly intended to further that plan's purpose. Because a rational jury could have found the elements of conspiracy beyond a reasonable doubt, we find that the evidence was sufficient to support the verdict.

¶27.   We turn to the weight of the evidence. "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand

21

would sanction an unconscionable injustice." ***Bush***, 895 So. 2d at 844. A motion for a new trial is addressed to the discretion of the court, which sits as a "thirteenth juror." ***Bush***, 895 So. 2d at 844 (quoting ***Amiker v. Drugs For Less, Inc.***, 796 So. 2d 942, 947 (Miss. 2000)). The court will reverse if, in its role as the "thirteenth juror," and weighing the evidence in the light most favorable to the verdict, the court "disagrees with the jury's resolution of the conflicting testimony." ***Bush***, 895 So. 2d at 844. But "the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." ***Id.*** (quoting ***Amiker***, 796 So. 2d at 947).

¶28.    Hartfield argues that Dixon's testimony should be afforded no weight because Dixon told the police that he had committed the murder but then changed his story at trial, when he testified that Hartfield had murdered Tabitha. He argues that Bryant's testimony was suspect because Bryant admitted to having viewed a news broadcast about the crime. He also argues that Graham's statement to the police that Hartfield did not know about the murder should be given great weight because Graham never changed her story. Examining the evidence as "the thirteenth juror," in the light most favorable to the verdict, the evidence was not so extremely conflicting or incredible that a new trial is required. We find that the evidence did not preponderate so heavily against the verdict that to allow the verdict to stand would sanction an unconscionable injustice. The verdict was not against the overwhelming weight of the evidence.

**CONCLUSION**

¶29.    Because Graham's statements in her letters were not against her penal interest, they were not admissible under Rule 804(b)(3). The trial court's denial of one of Hartfield's

22

peremptory strikes was not clearly erroneous. The evidence was sufficient to support the verdict, and the verdict was not against the overwhelming weight of the evidence. Therefore, we reverse the judgment of the Court of Appeals and reinstate and affirm the judgment of the Circuit Court of Lamar County.

¶30. **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE LAMAR COUNTY CIRCUIT COURT'S CONVICTION OF CONSPIRACY TO COMMIT MURDER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH CONDITIONS, IS REINSTATED AND AFFIRMED.**

**WALLER, C.J., RANDOLPH, P.J., AND PIERCE, J., CONCUR. LAMAR, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, KING AND COLEMAN, JJ. COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., KITCHENS AND KING, JJ.**

**DICKINSON, PRESIDING JUSTICE, DISSENTING:**

¶31. I fully agree with Justice Coleman's well-reasoned view that the circuit judge erred by excluding Graham's statements against interest. Because I believe the circuit judge also arbitrarily denied Hartfield's right to exercise a peremptory strike, I write this dissent.

¶32. The circuit judge's pretext finding on Hartfield's race-neutral reason for striking venire member sixteen was clearly erroneous. After the State established a prima facie case of racial discrimination, Hartfield argued that he struck venire member sixteen because he slept during defense counsel's voir dire. Specifically, defense counsel stated that "[h]e kept yawning and I would look and he wasn't firmly asleep, but the reason was when Mr. Whitacre was asking questions he would nod back and shut his eyes."

¶33. The circuit judge acknowledged that venire member sixteen had yawned. The circuit

23

judge agreed that he had closed his eyes. But simply because the circuit judge believed that he never actually fell asleep, he found Hartfield's proffered explanation to be pretext for racial discrimination. This conclusion both ignored defense counsel's argument that "he wasn't firmly asleep" and extrapolated pretext from a mere difference between defense counsel and the judge's apprehensions of agreed-upon appearances. This ruling was clearly erroneous. And because the arbitrary denial of a defendant's peremptory strike violates due process, this error requires reversal.[4]

**KITCHENS, KING AND COLEMAN, JJ., JOIN THIS OPINION.**

**COLEMAN, JUSTICE, DISSENTING:**

¶34. Pursuant to Mississippi Rule of Evidence 804(b)(3), the test for whether a statement is against the penal interest of the declarant requires the Court to determine whether the *reasonable person* would not have made the statement unless the declarant believed it to be true. With respect, I believe the plurality strays from the standard set forth in Rule 804(b)(3) when it holds that because, if charged as an accessory, Graham would not technically have been guilty or, alternatively, would have been able to plead the affirmative defense of duress, the statements contained in the two letters were not against her interest. Accordingly, I agree with the disposition reached by the Court of Appeals and would affirm that court's reversal of Hartfield's conviction.

¶35. The opinion of the learned and well-trained plurality of the justices on the Court, drafted not only with the benefit of research and training in the law but with time to ruminate

---

[4] ***Stewart v. State***, 662 So. 2d 552, 560 (Miss. 1995).

upon the case and aided by law clerks, does not necessarily equate to the reasonable person similarly situated to Graham when she wrote the letters at issue, and the fact that the justices of the Court realize she would not actually have been guilty of accessory or would have had a strong affirmative defense available to her does not mean that the "reasonable [woman] *in [her] position* would not have made the statement unless [she] believed it to be true." Miss. R. Evid. 804(b)(3). In my opinion, a reasonable person in the position of Graham indeed would not have made the statements she did unless she believed them to be true.

¶36. I have searched for, but been unable to find, precedent to guide me authoritatively in defining the reasonable person in a Rule 804(b)(3) context. Many of our cases addressing the statement against interest exception in criminal cases discuss corroboration, *e.g.*, *Lacy v. State*, below, but few, if any, discuss what it means that the reasonable person would not have made the statements unless he believed them to be true. In other contexts, such as self-defense, we have written that the standard "presupposes an individual without serious mental and emotional defects." *Hart v. State*, 637 So. 2d 1329, 1339 (Miss. 1994) (citing *Taylor v. State*, 452 So. 2d 441, 449 (Miss. 1984)). Elsewhere, in a discussion of imperfect self-defense, we have described the reasonable person as one "of average prudence." *Batiste v. State*, 121 So. 3d 808, 845 (¶ 74) (Miss. 2013) (citing *Hart*, 637 So. 2d at 1339); *Page v. State*, 64 So. 3d 482, 488 (¶ 24) (Miss. 2011) ("In order for a homicide to be justified as self-defense, the actor's apprehension of danger must appear objectively real to a reasonable person of average prudence.") (quoting *Jones v. State*, 39 So. 3d 860, 865 (Miss. 2010)).

¶37. The theme of prudence conjoined with the reasonable person standard also permeates our discussion of reasonable care in the civil negligence arena. *See Eli Investments, LLC*

*v. Silver Slipper Casino Venture, LLC*, 118 So. 3d 151, 154 (¶ 12) (Miss. 2013) ("The standard of care applicable to negligence cases is whether the defendant 'acted as a reasonable and prudent person would have under the same or similar circumstances.'") (quoting *Donald v. Amoco Prod. Co.*, 735 So.2d 161, 175 (¶ 48) (Miss. 1999)).

¶38. Another factor from the text of Rule 804(b)(3) worth noting is the following: the circumstances of the declarant matter. Again, the rule provides as follows:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man *in his position* would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

(Emphasis added.) The exception applies not just to the reasonable man, but the reasonable man *in the position* of the declarant.

¶39. The plurality fails to consider the position in which Graham found herself at the time she wrote the letters. The plurality considers whether the statement was against Graham's interest not from the objective standard of a person of average prudence, but from the absolute standard of whether, regardless of her position and regardless of what the reasonable woman might have thought in Graham's position, Graham could have been successfully prosecuted as an accessory. In other words, the plurality's conclusion, "Because Graham's statements in her letters were not against her penal interest, they were not admissible under Rule 804(3)(b)," misstates the standard imposed in the rule itself. The conclusion reached under the correct standard would address whether the reasonable woman – as I define her

26

above – in Graham's position at the time she wrote the letters, would not have made the statements unless they were true.

¶40. Finally, I am of the opinion that the Court of Appeals properly cited and followed our opinion in *Lacy v. State*, 700 So. 2d 602 (Miss. 1997), wherein we wrote as follows:

> Corroboration as required by Rule 804(b)(3) is not required to be absolute, and the sufficiency of the corroboration must be assessed in the light of the importance of the evidence and the offeror's fundamental constitutional right to present evidence. In *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), the United States Supreme Court declared:
>
> > Few rights are more fundamental than that of an accused to present witnesses in his own defense. *E.g.*, *Webb v. Texas*, 409 U.S. 95, 93 S. Ct. 351, 34 L. Ed. 2d 330 (1972); *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920 [1923] 18 L. Ed. 2d 1019 (1967); *In re Oliver*, 333 U.S. 257, 68 S. Ct. 499, 92 L. Ed. 682 (1948). In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.
>
> *Id.* at 302, 93 S.Ct. at 1049.

*Lacy v. State*, 700 So. 2d 602, 607 (¶ 15) (Miss. 1997). I agree with the Court of Appeals' recitation of the corroborating facts, which reads as follows:

Graham admits cooperation with Dixon and details the steps they took.

27

Graham acknowledged that the conspiracy to kill and bury Tabitha was between herself and Dixon, not Hartfield. In the letter to Hartfield, Graham confesses to assisting Dixon and apologizes for it. In fact, the only evidence of potential guilt against Hartfield is Dixon's later testimony.

Graham was situated to commit the crime. After her arrest, she admitted to being present for the conspiracy, murder, and burial. She admitted to playing an active role throughout. She knew details of the crime that only a person with direct knowledge would have known. On the other hand, Hartfield testified he was asleep on the couch, a fact that both Graham and Dixon confirmed.

Next, Graham admitted in her letters to taking part in the murder. In Dixon's statement, he killed Tabitha. Both of these statements occurred shortly after the murder and Graham's and Dixon's arrests.

Graham provided all of the details of the murder, which were substantiated by Dixon's statements to the police, her mother, and Decker. Such close relationships as between Graham and her mother, and Graham and Decker, indicate trustworthiness.

Most importantly, there was independent corroboration. First, Dixon admitted that he committed the murder. Dixon's admission is consistent with Graham's description of what happened. Next, Graham's statement of what happened was consistent with Dr. Steven Hayne's findings in the autopsy. Finally, the details of the crime were consistent in Dixon's testimony and Graham's letters.

¶41. Because I am of the opinion that the plurality applies a legal standard divergent from that set forth in Mississippi Rule of Evidence 804(3)(b), the letters in question were of critical importance to Hartfield's defense, and the statements found in the letters were sufficiently corroborated by other evidence, I respectfully dissent.

**DICKINSON, P.J., KITCHENS AND KING, JJ., JOIN THIS OPINION.**