# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-KA-01146-SCT

*DAVID THOMAS a/k/a DAVID LEE THOMAS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/06/2016 |
| TRIAL JUDGE: | HON. JEFF WEILL, SR. |
| TRIAL COURT ATTORNEYS: | BRAD McCULLOUCH |
| | GRETA HARRIS |
| | CHRISTOPHER ROUTH |
| | ERIC BROWN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | MICHELE PURVIS HARRIS |
| | DAVID THOMAS (PRO SE) |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LISA L. BLOUNT |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/14/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     David Thomas admitted in oral and written statements to police that he and Jontez Garvis had attacked Fred Jackson and stolen cash from him.  After being hospitalized for forty-one days due to the injuries inflicted by the two men, Jackson died.  Thomas was indicted for and convicted of capital murder.  The trial court sentenced Thomas to life in

prison without parole. After review, we affirm Thomas's conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶2. On January 29, 2012, Sean Snow, a deputy sheriff, responded to Tri-State Recycling, also known as The Can Man, located at 416 Woodrow Wilson Drive in the City of Jackson, First Judicial District of Hinds County, Mississippi, pursuant to a 911 call. The 911 caller reported that a man was lying unresponsive behind The Can Man. Deputy Snow found the man, who later was identified as Fred Jackson, lying on his back. According to Deputy Snow, Jackson's "[f]ace was kind of bluish gray," his face was bruised, and he had "dried up blood on the right-hand side of his head." Deputy Snow called American Medical Response ("AMR") and the fire department to the scene and they transported Jackson to University of Mississippi Medical Center ("UMMC"). Deputy Snow accompanied Jackson to UMMC where a physician informed him that Jackson had a "fifty/fifty chance."

¶3. Deputy Snow obtained and reviewed surveillance videotape footage from The Can Man. He testified that, on the surveillance videotape footage, he had observed two men entering The Can Man, moving to the rear of the property, and proceeding behind a parked truck. The two men "appeared to be striking Mr. Jackson" and continued doing so "somewhere around fourty [sic], forty-one, seconds."

¶4. Officer Felix Hodge of the Robbery Homicide Division of the Jackson Police Department received a tip that David Thomas was in a room at the Studio 6 Motel on Interstate-55 North. The record is silent as to how Thomas had become a suspect. According to Officer Hodge, the room was registered to a Tera Johnson and when an attempt

2

was made to contact the occupant of the room, Thomas initially said his name was Jerrell Davis. After Thomas was taken into custody, Officer Hodge recited *Miranda*[1] warnings and obtained Thomas's written waiver.

¶5.    Officer Hodge then interviewed Thomas. A video recording of the interview was played for the jury at Thomas's trial. Thomas said during the interview that he had gone to The Can Man to "get a battery to get cash" in order to finance a visit to Nightlife, a nightclub at which a rapper by the name of Future was to perform a show. In the jury's presence, Officer Hodge read the statement Thomas gave:

> Jontez [Garvis] came to my house that morning and got me. He asked me was I ready to go get those batteries? He said that he needed money for child support and pampers for his baby. We went through the pathway in the place. We were looking around but didn't find the batteries. I heard a noise, like, a welding machine or a generator. I asked [Garvis] did he hear that? And he said: No. I saw the truck. And I said: Man, there is somebody out here. He said: So, we can get him. We went up to the man and attacked him. I hit him once. [Garvis] hit him two or three times. We weren't planning on it to happen to him like that. I was scared from that morning on. [Garvis] called somebody to come pick us up. We went to the house. And I thought about it. We prayed that [Jackson] would make it through, and everything would be okay.

Thomas also indicated in his written statement and in the interview that he and Garvis had taken $250 from Jackson and that they had hit him with the rod with which he had been welding.

¶6.    After forty-one days at UMMC, Jackson died on March 9, 2012. On May 9, 2012, Thomas and Garvis were indicted jointly for capital murder. The State did not seek the death penalty and requested that the cases "be severed for purposes of jury trial." The Circuit

---

[1]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Court of the First Judicial District of Hinds County granted the motion to sever Thomas's and Garvis's jury trials.

¶7.    Dr. Erin Barnhart, who in 2012 was a deputy medical examiner with the Mississippi Medical Examiner's Office, testified that she performed the autopsy on Jackson on March 10, 2012.  Dr. Barnhart testified that Jackson's head had suffered multiple fractures: "fractures of the calvarium, or top of the head; fractures at the base of the skull which is the inner aspect of the cranial cavity; and multiple fractures of his face."  She continued: "[H]e had [] partially healed cerebral contusions or bruising of the brain" and "a subdural hematoma[,] which means blood within the cranial cavity between the brain and the surface of the skull."  Dr. Barnhart testified, to a reasonable degree of scientific certainty, that the cause of Jackson's death was complications of blunt head trauma, and the manner of his death was homicide.

¶8.    On cross-examination, Dr. Barnhart was asked about a notation in the autopsy report of "probable aspiration pneumonia."  According to Dr. Barnhart, aspiration pneumonia "is generally caused when someone cannot protect their airway," meaning "that they have an altered level of consciousness and therefore may aspirate or breath in mucus, and hence bacteria that are in their mouth," therefore, "a pneumonia may develop."  Dr. Barnhart testified that Jackson was to be discharged to a nursing home.  She stated that the aspiration pneumonia may have contributed to Jackson's death, but that aspiration pneumonia could be ruled out as a cause of death.

¶9.    The trial court denied Thomas's motion for a directed verdict.  After consultation with

4

the trial court and defense counsel about his right to testify in his defense, Thomas decided not to do so. The defense intended to call two witnesses, Dr. Steven Hayne and Jontez Garvis, for Thomas's case-in-chief.

¶10. Pretrial, the State had moved *in limine* to exclude the testimony of Dr. Hayne. After a ***Daubert***[2] hearing, the trial court granted the State's motion and excluded Dr. Hayne's testimony. The defense moved for reconsideration *ore tenus* before its case-in-chief, and the trial court denied the motion. The defense then called Jontez Garvis to testify.

¶11. After the close of testimony and closing arguments, the jury retired to deliberate. It found Thomas guilty of capital murder. The trial court sentenced Thomas to life imprisonment without the possibility of parole. The trial court denied Thomas's motion for judgment notwithstanding the verdict.

¶12. Thomas now appeals. His counsel raises two issues. First, he argues that the State failed to adduce sufficient evidence to support the jury's verdict. Second, he argues that the trial court erred by excluding Thomas's proposed expert defense witness, Dr. Hayne. Thomas also has filed a supplemental brief, *pro se*, in which he raises the following issues:

1.    Whether the trial court erred by finding Thomas competent to stand trial.

2.    Whether the trial court erred by denying Thomas's motion to recuse the trial judge.

3.    Whether the trial court misapplied ***Batson v. Kentucky***, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

---

[2] ***Daubert v. Merrell Dow Pharms., Inc.***, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

4. Whether the trial court erred by excluding Thomas's proposed expert defense witness, Dr. Steven Hayne.

5. Whether the trial court erred by denying jury instructions requested by Thomas's counsel.

6. Whether the trial court erred when it refused to instruct the jury on the elements of armed robbery.

7. Whether cumulative error requires reversal.

¶13. We address each issue in turn. For clarity, we will address Thomas's pro-se claim concerning Dr. Hayne together with his counsel's claim. We also will combine our discussion of the errors that Thomas claims concerning the jury instructions. Additional facts and procedural history will be discussed as necessary for each issue.

**ANALYSIS**

**I. Whether the State adduced sufficient evidence to support the jury's verdict.**

¶14. Thomas's counsel first argues that "[t]he expert testimony from Dr. Barnhart shows that the State failed to prove beyond a reasonable doubt that any damage inflicted by the Defendant was the legal cause of death." Dr. Barnhart testified, to a reasonable degree of scientific certainty, that the cause of Jackson's death was complications of blunt head trauma, and the manner of his death was homicide. Dr. Barhnart testified that aspiration pneumonia "certainly may been contributory," but that aspiration pneumonia could be ruled out as a cause of Jackson's death.

¶15. This Court, in **Shelton v. State**, 214 So. 3d 250, 256 (Miss. 2017), detailed our familiar standard of review for a challenge to the sufficiency of the evidence:

6

This Court reviews a challenge to the sufficiency of the evidence under the standard detailed in *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005) [*abrogated on other grounds by Little v. State*, 233 So. 3d 288, 292 (Miss. 2017)]. We recognize that "the critical inquiry" under the standard is whether the evidence supports a finding that the accused "committed the act charged . . . under such circumstances that every element of the offense existed." *Id*. "'[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (emphasis in original)). Further:

> if a review of the evidence reveals that it is of such quality and weight that, "having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense," the evidence will be deemed to have been sufficient.

*Id*.; *see also Roby v. State*, 183 So. 3d 857, 869 (Miss. 2016).

*Shelton*, 214 So. 3d at 256.

¶16.    "The killing of a human being without the authority of law by any means or in any manner shall be capital murder . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery . . . ." Miss. Code Ann. § 97-3-19(2)(e) (Rev. 2014). Thomas admitted to police that he had gone to The Can Man location with Garvis and he admitted that he had attacked Jackson: "I hit him once. Jontez hit him two or three times." Thomas also confessed that he and Garvis had taken $250 from Jackson.

¶17.    The defense took the position at trial that Thomas was at The Can Man and had participated in the robbery, but that the cause of Jackson's death was not the injuries sustained during the robbery, but rather aspiration pneumonia which was contracted during

7

Jackson's hospital stay. On appeal, the defense maintains its argument that the testimony of Dr. Barnhart was insufficient to support the capital-murder conviction.

¶18. This Court considered a case in which the victim had been shot six times and died in the hospital "several days after his admission for treatment of his gunshot wounds. . . ." *Holliday v. State*, 418 So. 2d 69, 70-71 (Miss. 1982). The decedent's treating surgeon testified that "the cause of death was overwhelming infection secondary to his injuries." *Id.* at 71. Next, the surgeon agreed that the "cause of death was gunshot wounds." *Id*. In its analysis, the *Holliday* Court recognized:

> The unlawful act or omission of accused need not be the sole cause of death. The test of responsibility is whether the act of accused contributed to the death, and, if it did, he is not relieved of responsibility by the fact that other causes also contributed. Moreover, responsibility also attaches where the injury materially accelerates the death, although the death is proximately occasioned by a preexisting cause.

*Id.* (quoting *Schroer v. State*, 250 Miss. 84, 91, 160 So. 2d 681 (1964)) (citation omitted). This Court held that "the jury was justified in determining the gunshot wounds were a substantial contributing cause of death." *Id*.

¶19. Here, the jury was justified in its finding, based on the testimony of Dr. Barnhart, that the cause of Jackson's death was complications of blunt-force trauma, irrespective of the fact that aspiration pneumonia was a possible contributing cause of death. This issue is without merit.

**II. Whether the trial court erred by excluding Thomas's proposed expert defense witness, Dr. Steven Hayne.**

¶20. Thomas's counsel contends that the trial court's exclusion of Dr. Steven Hayne's

proposed testimony deprived Thomas of presenting his sole theory of defense. In his pro-se brief, Thomas agrees, claiming that he was denied his fundamental right to present a meaningful defense.

¶21. This Court applies an abuse-of-discretion standard to the trial court's admission or exclusion of expert testimony. *Gillett v. State*, 56 So. 3d 469, 494 (Miss. 2010 (citing *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31 (Miss. 2003)). Mississippi Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

M.R.E. 702. This Court has held that:

> "[T]he opinion of an expert witness must be stated with reasonable certainty, given the state of knowledge in the field in which the expert is qualified." *West v. State*, 553 So. 2d 8, 20 (Miss. 1989) (citations omitted). In other words, these opinions "must rise above mere speculation." *Williams v. State*, 35 So. 3d 480, 486 (Miss. 2010) (quoting *Goforth v. City of Ridgeland*, 603 So. 2d 323, 329 (Miss. 1992)). "[I]ndefinite" expert opinions, or those "expressed in terms of mere possibilities," are not admissible. *West*, 553 So. 2d at 20 (citing *Scott County Co-op v. Brown*, 187 So. 2d 321, 325-26 (Miss. 1966); *Gen. Benevolent Assoc. v. Fowler*, 210 Miss. 578, 589, 50 So. 2d 137, 142 (1951)). For example, we have held that an expert's offering a "reasonable hypothesis" was insufficient, explaining that "[e]xpert testimony

9

should be made of sterner stuff." *Goforth*, 603 So. 2d at 329.

*Parvin v. State*, 113 So. 3d 1243, 1247 (Miss. 2013).

¶22. Thomas's counsel is correct to point out that "'when a State brings it judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense.'" *Isham v. State*, 161 So. 3d 1076, 1081 (Miss. 2015) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 70, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985)). *Ake* "addressed an indigent defendant's right to expert witnesses, concluding that the right at stake implicated a defendant's access to justice:"

> Meaningful access to justice has been the consistent theme of these cases. We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.

*Ake*, 470 U.S. at 70.

¶23. *Ake* and the other cases cited by Thomas's counsel, though, relate to the defendant's entitlement to an expert witness, which is not an issue here, as the trial court authorized expert funding to enable the defense to hire an independent pathologist. The issue here is whether the trial court erred in finding that Dr. Hayne's testimony did not meet the Mississippi standards for admissibility. This Court never has held that the defendant's entitlement to an expert witness obviates a determination of the admissibility of the expert's proposed testimony under Mississippi Rule of Evidence 702.

¶24. Pretrial, Dr. Hayne submitted a report to the defense in which he opined that:

> The summary of the case would indicate this individual suffered severe facial

10

and head injury secondary to assault resulting in blunt force trauma of a critical nature that was subsequently resolved to the point that he could be discharged from medical care and while in the process of being discharge[d], this individual developed nosocomial infection and died. It seems unlikely that he died from probable aspiration pneumonia as reported in the postmortem examination and that he would have a protected airway with a tracheostomy tube in place. Furthermore, feeding and nutrition was provided through a gastrostomy catheter.

Dr. Hayne said that Jackson's physicians had indicated that he had required "24-hour a day, seven-day a week care and he needed to be in a nursing home."

¶25. During the *Daubert* hearing, Dr. Hayne proffered testimony that Jackson had died from nosocomial pneumonia, or hospital-acquired pneumonia. He maintained that he could discern Jackson's cause of death from Jackson's medical records, which indicated that UMMC had administered "Staph aureus medication," a "specific treatment for Pneumonia, hospital acquired." Dr. Hayne continued that the manner of death was "therapeutic complication," which he agreed is a relatively new manner of death classification. Dr. Hayne stated that "therapeutic complication" is used "in multiple jurisdictions" as a cause of death. He referenced only New Jersey and Connecticut, but then said that use of "therapeutic complication" as a cause of death is "growing very rapidly." Dr. Hayne agreed that "therapeutic complication" as a cause of death never has been accepted by a court.

¶26. The trial court granted the State's motion to exclude Dr. Hayne's testimony, finding it "entirely too speculative to be submitted to the jury in any fashion." The trial court found that Dr. Hayne had not testified to a reasonable degree of medical certainty and that his report "is devoid of any such medical certainty." The trial court referenced Dr. Hayne's use of "uncertain terms such as 'it seems unlikely that [Jackson] died from probable aspiration

11

pneumonia.'" Moreover, the trial court observed that "it is undisputed that the victim was in the hospital strictly because of the severe injuries he sustained during the alleged beating by this defendant." The defense moved for reconsideration *ore tenus* before its case-in-chief and the trial court denied the motion, reasoning that "Dr. Hayne's opinions were speculative and unsure."

¶27. Here, it is clear from the record that Dr. Hayne's opinions were not offered to a reasonable degree of medical certainty. Dr. Hayne indicated that the "therapeutic complication" cause of death classification never has been accepted in court. The trial court also recognized that Dr. Hayne used "uncertain terms such as 'it seems unlikely that [Jackson] died from probable aspiration pneumonia.'" Accordingly, the trial court cannot be said to have abused his discretion in excluding Dr. Hayne's testimony.

¶28. Further, as discussed in Issue I, we have held that "[t]he unlawful act or omission of accused need not be the sole cause of death. The test of responsibility is whether the act of accused contributed to the death, and, if it did, he is not relieved of responsibility by the fact that other causes also contributed." *Holliday*, 418 So. 2d at 70-71(quoting *Schroer*, 250 Miss. at 91). Thus, even if the testimony of Dr. Hayne had been deemed admissible, the jury still would have had the authority to convict Thomas. Also, in closing argument, Thomas's counsel did argue to the jury that Jackson was healed of the wounds caused by Thomas when he died from pneumonia. This issue is without merit.

### III. Whether the trial court erred by finding Thomas competent to stand trial.

¶29. Thomas argues that he was mentally incompetent to stand trial. "We will reverse a

12

trial court's competency determination only if it is 'manifestly against the overwhelming weight of the evidence.'" ***Dickerson v. State***, 175 So. 3d 8, 15 (Miss. 2015) (quoting ***Hearn v. State***, 3 So. 3d 722, 728 (Miss. 2008)). The standard for competence to stand trial as defined by the United States Supreme Court asks "'whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . and whether he has a rational as well as factual understanding of the proceedings against him.'" ***Hearn***, 3 So. 3d at 728 (quoting ***Dusky v. United States***, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960)). To be competent to stand trial, a defendant must be one:

> (1) who is able to perceive and understand the nature of the proceedings; (2) who is able to rationally communicate with his attorney about the case; (3) who is able to recall relevant facts; (4) who is able to testify in his own defense if appropriate; and (5) whose ability to satisfy the foregoing criteria is commensurate with the severity of the case.

***Hearn***, 3 So. 3d at 728 (quoting ***Martin v. State***, 871 So. 2d 693, 697 (Miss. 2004)).

¶30. At the time of Thomas's trial, Mississippi Uniform Rule of Circuit and County Court Practice 9.06[3] provided the following:

> If before or during trial the court, of its own motion or upon motion of an attorney, has reasonable ground to believe that the defendant is incompetent to stand trial, the court shall order the defendant to submit to a mental examination by some competent psychiatrist selected by the court in accordance with § 99-13-11 of the Mississippi Code Annotated of 1972.
>
> After the examination the court shall conduct a hearing to determine if the defendant is competent to stand trial. After hearing all the evidence, the court shall weigh the evidence and make a determination of whether the defendant

---

[3] This provision since has been replaced by Mississippi Rule of Criminal Procedure 12.2, which became effective July 1, 2017. For purposes of this case, Mississippi Uniform Rule of Circuit and County Court Practice 9.06 applies.

is competent to stand trial. If the court finds that the defendant is competent to stand trial, then the court shall make the finding a matter of record and the case will then proceed to trial.

URCCC 9.06.

¶31. Here, the trial court appointed Dr. Benjamin Root to perform a competency evaluation on Thomas. Dr. Root assessed Thomas on December 12, 2013, and reported "to a reasonable medical certainty that the defendant is incompetent to stand trial at this time." Dr. Root observed that Thomas "cannot work with his attorney and cannot comprehend his legal situation to any reasonable level that would pass constitutional muster.

¶32. On June 17, 2014, the trial court conducted a competency hearing. Dr. Root testified that Thomas suffers from schizoaffective disorder, schizophrenia, and possibly bipolar disorder and that he was not competent to stand trial at that time. Dr. Root was cross-examined with regard to errors in the report he produced, including the defendant's race. Dr. Root stated the date of Thomas's arrest but could not recall where he obtained that information. Dr. Root stated that his interview with Thomas lasted between forty-five minutes and one hour.

¶33. After Dr. Root's testimony at the hearing, the State proposed, and the defense agreed, that Thomas should have another medical examination done at the Mississippi State Hospital at Whitfield, Mississippi. The trial court ordered a second mental evaluation, finding that, after the first hearing, it "was unable to make a determination regarding the defendant's competency to stand trial due to a lack of specificity and information procured from the witness and his report."

14

¶34. Dr. W. Criss Lott evaluated Thomas on August 15, 2014, and December 21, 2014. Dr. Lott's report indicated that, it was his opinion, "to a reasonable degree of psychological certainty, that Mr. Thomas has a marginal, but sufficient present ability to consult with his attorney with a reasonable degree of rational understanding in perparation [sic] of his defense" and that he "has a rational as well as factual understanding of the nature and object of the legal proceedings against him." Dr. Lott was not called to testify at Thomas's second competency hearing because Thomas's counsel at the hearing conceded Dr. Lott's competency finding. In the absence of an objection or a request to cross-examine Dr. Lott, the trial court found Thomas competent to stand trial.

¶35. Dr. Lott's report thoroughly analyzed each of the applicable factors and concluded that Thomas was competent to stand trial. It cannot be said that the trial court's finding that Thomas was competent to stand trial was against the overwhelming weight of the evidence.

### IV. Whether the trial court erred by denying Thomas's motion to recuse the trial judge.

¶36. In January 2015, Thomas's then-counsel, Alison Kelly, sought the recusal of the trial judge. According to Kelly, Circuit Judge Jeff Weill, Sr., had authored a letter to the Hinds County Board of Supervisors asserting "that the appointment [of] private attorneys [was] necessary because the attorney Alison Kelly, attorney of record in the case at bar, is both an incompetent and non law-abiding attorney." Judge Weill had stated in the letter to the Board of Supervisors that "'good cause' has been shown to preclude Ms. Kelly from participating in any matter involving indigent representation in my courtroom . . ." and that "I want the board to be aware that Ms. Kelly's failure to comply with the law and the requirements of her

15

position will necessarily result in some additional expense by way of appointment of separate counsel." The trial court denied the motion for recusal.

¶37. In fifty-five cases, including Thomas's, the Hinds County Public Defender's Office (HCPDO) sought to recuse Judge Weill. *In Re: Office of the Hinds County Public Defender*, No. 2015-M-00397 (Miss. May. 21, 2015). This Court did not "find a sufficient basis for ordering Judge Weill's recusal in any pending or future case." *Id*. This Court, however, found it appropriate "for the HCPDO, should it so desire, to inform each of its previous clients in the fifty-five cases before us, that they may choose to continue with the private counsel Judge Weill has appointed to represent them, or they may choose to have the HCPDO reassume their representation." *Id*. In accordance with this Court's order, Thomas filed an Option of Counsel By Defendant, in which he chose "to return to the Office of the Hinds County Public Defender" instead of continuing "with the private lawyer Judge Weill appointed to my case."

¶38. This Court has held that "[a] judge's determination of recusal is reviewed through the lens of an abuse-of-discretion standard." *Patton v. State*, 109 So. 3d 66, 77 (Miss. 2012) (citing *Miss. United Methodist Conference v. Brown*, 929 So. 2d 907, 908 (Miss. 2006)). "'This Court applies an objective standard when deciding whether a judge should have disqualified himself.'" *Patton*, 109 So. 3d at 77 (quoting *Jones v. State*, 841 So. 2d 115, 135 (Miss. 2003)). "'On appeal, a trial judge is presumed to be both qualified and unbiased, and this presumption may only be overcome by evidence which produces a reasonable doubt about the validity of the presumption.'" *Id*.

16

¶39.    Here, this Court already has found no sufficient basis to order the recusal of Judge

Weill. *In Re: Office of the Hinds County Public Defender*, No. 2015-M-00397 (Miss. May.

21, 2015). The Court did, however, indicate that:

> In future cases in which the Hinds County Public Defender or a particular
> assistant public defender believes Judge Weill—or any circuit judge—should
> recuse from a particular case, he or she may file with that judge an appropriate
> motion to recuse, setting forth the particular facts and circumstances that
> suggest the circuit judge cannot preside impartially over the case.

*Id.* After this Court's order, Thomas did not again seek the recusal of Judge Weill.  Instead,

pursuant to this Court's order, Thomas agreed to retain the Office of the Hinds County Public

Defender.  We see no reason now to adjust our previous ruling simply because Thomas raises

the issue pro-se on direct appeal.  Thomas has presented no evidence to create a reasonable

doubt as to the validity of the presumption that the trial judge was both qualified and

unbiased.[4]  Thus, we affirm Judge Weill's denial of the motion to recuse.

> V.    Whether the trial court misapplied *Batson v. Kentucky*, 476 U.S. 79,
> 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

¶40.    During *voir dire*, the prosecutor raised a challenge pursuant to *Batson v. Kentucky*,

476 U.S. 79, 106 S. Ct. 1712,  90 L. Ed. 2d 69 (1986), arguing that the defense had struck

"every available white person tendered . . . ."  For two of the jurors, the trial court determined

---

[4] Now on direct appeal, in order to demonstrate "the malice this trial court judge
holds for most members of the Hinds County Public Defender's Office," Thomas asks this
Court to take judicial notice of *Routh v. State*, 227 So. 2d 959, 960 (Miss. 2017).  In *Routh*,
Judge Weill held Christopher Routh, an assistant public defender with the Hinds County
Public Defender's Office, in direct criminal contempt.  *Routh*, 227 So. 2d at 961.  This
Court affirmed Judge Weill's decision, holding that "[d]isrupting the court by disrupting a
judge's ruling—after being expressly told not to—supports a finding of criminal contempt."
*Id.* at 963.  A finding of direct criminal contempt in an unrelated case has no bearing on
whether Judge Weill should have recused in the present case.

that the defense's proffered race-neutral explanations were pretextual and granted the State's *Batson* challenges.

¶41.    "This Court will overturn a trial court's *Batson* ruling only if it was clearly erroneous or against the overwhelming weight of the evidence." *Hartfield v. State*, 161 So. 3d 125, 137 (Miss. 2015) (citing *Batiste v. State*, 121 So. 3d 808, 848 (Miss. 2013)).  "Because a *Batson* ruling is largely based on credibility, we give great deference to the trial court's decision." *Id*.  "*Batson* forbids the prosecution from racially discriminating through the use of peremptory challenges." *Hartfield*, 161 So. 3d at 137 (citing *Batson*, 476 U.S. at 89).

¶42.    This Court and the United States Supreme Court have held that the defense also is precluded from employing peremptory challenges in a racially discriminatory manner. *Hardison v. State*, 94 So. 3d 1092, 1097 (Miss. 2012); *Georgia v. McCollum*, 505 U.S. 42, 59, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992) ("We hold that the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges.").  "When the State challenges the defense's use of a peremptory challenge[] as racially discriminatory, this Court refers to it as a 'reverse-*Batson*' challenge." *Hartfield*, 161 So. 3d at 137 (quoting *Hardison*, 94 So. 3d at 1097).  Three steps guide the trial court's handling of a *Batson* challenge:

> First, the party objecting to the peremptory strike of a potential juror must make a prima facie showing that race was the criterion for the strike. Second, upon such a showing, the burden shifts to the State to articulate a race-neutral reason for excluding that particular juror.  Finally, after a race-neutral explanation has been offered by the prosecution, the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory strike, i.e., that the reason given was a pretext for discrimination.

18

*Hartfield*, 161 So. 3d at 137 (quoting *Pitchford v. State*, 45 So. 3d 216, 224 (Miss. 2010)).

The United States Supreme Court has held that:

> [R]ace-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. We have recognized that these determinations of credibility and demeanor lie "'peculiarly within a trial judge's province,'" and we have stated that "in the absence of exceptional circumstances, we would defer to [the trial court]."

*Hartfield*, 161 So. 3d at 138-39 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008)).

¶43.    In *Hartfield*, the trial court evaluated the defense's proffered race-neutral reason for the strike, that a prospective white juror "had been asleep during voir dire." *Hartfield*, 161 So. 3d at 139. The defense had exercised its "first seven peremptory strikes on white jurors, while accepting all African-American jurors tendered." *Id*. at 138. The trial court in that case determined that the proffered race-neutral reason for the prospective juror's exclusion was prextext, having himself observed that the prospective juror "had not been sleeping, but had yawned and closed his eyes . . . ." *Id*. at 139.

¶44.    Here, the trial court found that the State had made a *prima facie* case that the defense had engaged in race discrimination in jury selection. The court then asked defense counsel "to state a non-race, non-gender or non-religious based reason" to justify the peremptory strikes.

¶45.    With regard to Loicka Hodges, the first white juror struck by the defense, Defense

19

counsel said that she did not bow her head to pray with the other venire members when the trial court had offered a prayer earlier in the proceedings. Defense counsel also pointed out that Hodges had been born in France and had spent thirty "or so years of her life in France." Defense counsel expressed concern with regard to the "possible distinction she's going to make between the laws of France versus the laws of the United States." Finally, defense counsel stated that Hodges had not participated in *voir dire* "in almost any fashion" and that he "didn't really get any answers from her." The trial court granted the State's **Batson** challenge and allowed Hodges to sit as a juror.

¶46. Defense counsel stated that Edward Milam, the second prospective white juror struck, had not spoken during *voir dire* by the State or by the defense: "since he never talked[,] the unknown is so large." According to defense counsel, Milam worked at McNeely Plastics, possibly as a tradesman. Defense counsel continued: "if he is a tradesman, I don't want a juror placing themselves in the shoes of the victim in this case . . . ." Defense counsel stated, "I don't know if [Milam] was paying attention during voir dire. But I know he did not participate." The trial court found the defense's justification for the strike to have been pretextual and that the defense "was engaged in purposeful discrimination."

¶47. Defense counsel argued that he struck Danny Fultz, the third prospective white juror, because of his work as a machinist at Eaton Aerospace. The victim in the case was a welder and was welding at the time of the attack. Defense counsel also mentioned that "we brought him back" and "[h]e gave us some more information." When "brought back," Fultz had informed the court and the lawyers that his father had been a victim of "an investor [who]

20

cheated him out of some money" and that, due to his father's experience," he "hope[d]" that he could be impartial. The trial court allowed the defense to strike Fultz.

¶48. Evidence in the record supports the trial court's determination that the defense's proffered race-neutral reasons for striking the jurors were pretextual. As to Hodges, the trial court did not accept defense counsel's proposed reason that Hodges kept her eyes open during the initial prayer as a legitimate race-neutral reason. Also, in regard to Milam, the trial court noted that defense counsel did not strike a number of other jurors who had not spoken during voir dire. Further, the record reveals that the trial court resolved the **Batson** challenge against Fultz in Thomas's favor. After review of the record, we cannot say that the decision of the trial court to include Hodges and Milam on Thomas's jury is clearly erroneous or against the overwhelming weight of the evidence. We defer to the judgment of the trial court. This issue is without merit.

###    VI.    Whether the trial court abused its discretion in instructing the jury.

¶49. "This Court reviews the grant or denial of jury instructions for abuse of discretion." **Hale v. State**, 191 So. 3d 718, 723 (Miss. 2016) (citing **Victory v. State**, 83 So. 3d 370, 373 (Miss. 2012)). "'A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.'" **Hale**, 191 So. 3d at 723 (quoting **Newell v. State**, 49 So. 3d 66, 73 (Miss. 2010)). "A lesser offense is necessarily included in the greater offense if the elements of the greater offense include all the elements of the lesser offense,

such that the greater cannot be committed without also committing the lesser." ***Hye v. State***, 162 So. 3d 750, 754 (Miss. 2015) (citing ***Porter v. State***, 616 So. 2d 899, 909-10 (Miss. 1993) (Hawkins, J., specially concurring)).

### A. Whether the trial court abused its discretion by denying proffered defense instructions.

¶50. Thomas claims on appeal that the trial court erred by denying instructions the defense had sought defining various offenses, which he contends constituted lesser-included offenses to capital murder. Instructions D-5 and D-6 informed the jury that if the State had failed to prove any element of capital murder beyond a reasonable doubt, the jury should consider either aggravated assault (D-5) or culpable-negligence manslaughter (D-6). Instruction D-14 defined aggravated assault. Instruction D-16 was a heat-of-passion manslaughter instruction. Instruction D-17 was a form of the verdict instruction informing the jury how it should style its verdict if it found Thomas not guilty of capital murder, murder, manslaughter, or aggravated assault.

¶51. First, as to the instructions for aggravated assault, "[t]he law in Mississippi is that aggravated assault is not a lesser-included offense within the crime of murder." ***Johnson v. State***, 512 So. 2d 1246, 1251 (Miss. 1987) (citing ***Scott v. State***, 60 Miss. 268 (1882)), *overruled on other grounds by* ***Smith v. State***, 986 So. 2d 290 (Miss. 2008). Thus, Thomas was not entitled to an instruction on aggravated assault.

¶52. Second, as to the remaining instructions for culpable-negligence and heat-of-passion manslaughter, Thomas was not entitled to them as the evidence did not support the

22

instructions.[5] Thomas admitted in his oral and written statements to having hit Jackson with a welding rod in an effort to steal Jackson's money. No evidence supported a determination of negligence or heat of passion.

¶53. Therefore, the trial court did not abuse its discretion in denying the jury instructions proffered by defense counsel. We affirm on this issue, as it is without merit.

### B. Whether the trial court erred when it refused to instruct the jury on the elements of robbery.

¶54. Citing *Harrell v. State*, 134 So. 3d 266 (Miss. 2014), Thomas argues that the trial Court abused its discretion by not instructing the jury on the elements of robbery which constituted the underlying felony of his capital-murder charge. As discussed below though, Thomas's defense counsel requested that the trial court not instruct the jury on the elements of robbery.

¶55. It is axiomatic that "a defendant cannot complain on appeal of alleged errors invited or induced by himself." *Galloway v. State*, 122 So. 3d 614, 645 (Miss. 2013); *O'Connor v. State*, 120 So. 3d 390, 397 (Miss. 2013); *Singleton v. State*, 518 So. 2d 653, 655 (Miss. 1988). Further, "a defendant cannot complain of an instruction which he, not the state, requested." *Harris v. State*, 861 So. 2d 1003, 1015 (Miss. 2003); *Buford v. State*, 372 So. 2d 254, 256 (Miss. 1979).

---

[5] Culpable-negligence manslaughter is the "killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law . . . ." Miss. Code Ann. § 97-3-47 (Rev. 2014). Heat-of-passion manslaughter is "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a deadly weapon, without authority of law, and not in necessary self-defense. . . ." Miss. Code Ann. § 97-3-35 (Rev. 2014).

¶56. An excellent analysis of these principles in an almost identical fact pattern can be found in *State v. Hargrove*, 293 P.3d 787 (Kan. App. 2013). The *Hargrove* case effectively lays out the basis for the rule, stating that the purpose is to "bind[] trial counsel to strategic decisions inducing judicial rulings with the purpose of obtaining favorable judgments for their client." *Hargrove*, 293 P.3d at 795. The rule "also defeats the disreputable strategy aimed at requesting a judge act in a particular way to salt the record with error as an end in itself, thereby providing potential grounds for reversal of an adverse judgment." *Id*.

¶57. A multitude of courts have applied this doctrine in the context of jury instructions. *People v. Zapata*, 779 P.2d 1307, 1308–09 (Colo. 1989) ("The allegation of constitutional error in the jury instruction does not require us to abandon the strict preclusion of review of invited error"); *State v. Madigosky*, 966 A.2d 730 (Conn. 2009); *State v. Perdue*, 813 P.2d 1201, 1206 (Utah App. 1991); *State v. Henderson*, 792 P.2d 514, 515 (Wash. 1990) (recognizing that less-than-strict application of the invited-error rule to jury instructions "would put a premium on defendants misleading trial courts. . . ."); *United States v. Askew*, 403 F.3d 496, 505–06 (7th Cir. 2005) (finding that, where a defendant is aware of the omitted element in a jury instruction and yet relinquished his right to have it presented to the jury, the doctrine of invited error applies); *see also United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997)). A number of the cases that held otherwise based their decisions on the actions of defense counsel being inadvertent, negligent, or without strategic or tactical grounds. *People v. Bender*, 169 N.E.2d 328, 333 (Ill. 1960) (declining to apply the invited-error doctrine "[w]hen the State, the defense, and the court, all proceeded on an entirely erroneous belief

. . . ."); ***State v. Dozier***, 255 S.E.2d 552, 555 (W. Va. 1979) ("[I]t would be a travesty of justice to hold the accused invited the error . . . [as] it clearly appears . . . that the instruction was an unfortunate mistake."). Mississippi has applied the invited-error doctrine to jury instructions in ***Harris*** and ***Buford***. ***Harris***, 861 So. 2d at 1015; ***Buford***, 372 So. 2d at 256.

¶58.    It is important to note what this case is not. This is not a case in which the defendant successfully objected to the language of an elements instruction and the court neglected to correct the error or substitute language. Neither is this a case in which the State successfully objected to the language of an instruction to which the defendant was otherwise entitled and the court failed to substitute appropriate language. *See* ***Hunter v. State***, 684 So. 2d 625 (Miss. 1996). Finally, this is not a case in which a defendant negligently or inadvertently failed to object to a flawed elements instruction. *See* ***Harrell v. State***, 134 So. 3d 266 (Miss. 2014). Instead, it is a case in which the error might more appropriately be referred to as "demanded" by the defendant rather than "invited."

¶59.    In this case, the State offered Instruction S-2, which properly and appropriately set out the elements of capital murder and specifically referred the jury to Instruction S-3. Instruction S-3 properly and appropriately set out the elements of robbery. Defense counsel, after initially stating he had no objection, backtracked and objected to Instruction S-3. He noted, correctly, that in the indictment there was "no charge for robbery ," as the commission of robbery was merely an element of capital murder. Defense counsel made clear that there was no mistake. He acknowledged that robbery was listed in the indictment. The Court then requested counsel to explain the objection further. Defense counsel referred to the additional

instruction as confusing and complained that it treats robbery as a "second count." The State then agreed to withdraw the instruction. However, defense counsel once again inquired to be sure it had been withdrawn and, upon receiving an affirmative response, stated "All right. That's all I needed to know. I'm sorry." The Court later proceeded to amend Instruction S-2, to remove the reference to Instruction S-3, and renamed it Instruction S-2B. In response to the Court's explanation, defense counsel stated, "I'm clear now your honor. No objection."

¶60. The record demonstrates that defense counsel's successful objection to Instruction S-3 was a tactical decision. He acted with full knowledge of the consequences. He did not want the jury instructed on the elements of robbery. He felt that the instruction would be confusing to the jurors, misleading them into believing the defendant was charged with a second count. The tactical decision, whether wise or not, is further brought home in defense counsel's closing argument in which he stated the defendant had admitted that he had committed the crime of robbery and used it to support the defendant's credibility on the capital-murder issue in which he argued that "The State can't pick and choose what they want you to believe."[6]

¶61. Persons may relinquish their constitutional rights if they do so knowingly and

---

[6] If defense counsel's objection to Instruction S-3 was not a tactical decision, the defendant is not without recourse. As in any case in which the defendant alleges that his counsel was ineffective, the defendant may file a petition for post-conviction relief. Miss. Code Ann. § 99-39-1–29 (Rev. 2015).

voluntarily. Criminal defendants are no exception.[7] Further, the waiver need not be affirmatively reflected in the record. *Robinson v. State*, 345 So. 2d 1044, 1045 (Miss. 1977).

¶62. Likewise, with certain exceptions, criminal defendants are bound by the actions of their lawyers. *Hill*, 528 U.S. at 114–15. Jury instructions, unless explicitly opposed or insisted upon by the client, are left to the sound professional judgment of the attorney. *Perez*, 116 F.3d at 845. In fact, lawyers may compromise their clients' constitutional rights. *See Taylor v. Illinois*, 484 U.S. 400, 410–16, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988) (affirming the application of a preclusion sanction where it is determined that "a party's failure to comply with a request to identify his or her witnesses in advance of trial . . . was willful and motivated by a desire to obtain a tactical advantage. . . .").[8]

---

[7]*Maryland v. Shatzer*, 559 U.S. 98, 103–04, 130 S. Ct. 1213, 1219, 175 L. Ed. 2d 1045 (2010) (self-incrimination); *New York v. Hill*, 528 U.S. 110, 114–15, 120 S. Ct. 659, 145 L. Ed. 2d 560 (2000) (acknowledging criminal defendant may waive even fundamental rights); *Faretta v. California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975) (right to counsel). For example, an individual, having been advised in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), may give up the right against self-incrimination and submit to a custodial police interrogation. *Shatzer*, 559 U.S. at 103–112. And criminal defendants may forgo their constitutional right to counsel to represent themselves. *Faretta*, 422 U.S. at 835. But they may not later complain about adverse consequences resulting from their own conduct in waiving those rights. *Faretta*, 422 U.S. at 834–35, n.46 ("[W]hatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'"); *Illinois v. Allen*, 397 U.S. 337, 342–43, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970) (criminal defendant may lose Sixth Amendment right to be present at trial by continuing disruptive conduct despite trial judge's warning that persistence will result in removal). These same principles are embedded in Mississippi law. *Roberts v. State*, 234 So. 3d 1251, 1258–62 (Miss. 2017) (self-incrimination); *Baxter v. State*, 177 So. 3d 394, 403–06 (Miss. 2015) (self-incrimination); *Conn v. State*, 170 So. 2d 20, 21–23 (1964) (right to counsel).

[8] With slight modifications to adapt the analysis, the preceding two paragraphs are adopted from the analysis in *Hargrove*. *Hargrove*, 293 P.3d at 796.

¶63. The dissent relies on the language contained in *Harrell v. State*, 134 So. 3d 266 (Miss. 2014), and other cases, for the proposition that "it is the trial court's responsibility to assure that the jury is 'fully and properly instructed on all issues relevant to the case.'" *Harrell*, 134 So. 3d at 270. We absolutely and without reservation agree with this legal tenet. *Harrell*, though, does not control here. As discussed above, defense counsel invited this error.

¶64. Further, the State met its burden to instruct the jury by submitting proper instructions as to both the elements of capital murder and the underlying crime of robbery. *See Reddix v. State*, 731 So. 2d 591, 592 (Miss. 1999) ("Because it is the State's duty to prove every element of the crime beyond a reasonable doubt, the State also has a duty to make sure the jury is properly instructed with regard to the essential elements of the crime.") Once defense counsel strongly objected to the instructions, the State acquiesced. In the end, the trial judge accepted their communal position and gave an instruction that lacked the elements of the underlying crime. Trial courts expect and deserve guidance from the attorneys as to jury instructions. It is common practice for trial judges to accept agreements between the parties as to such issues, as it is assumed that the agreement is made for the mutual benefit of the parties or as a contemplated concession.

¶65. While the trial court would have been within its authority to insist on instructing the jury on the elements of the underlying felony, we decline to find any error. A reversal is not required where the trial court and the State both acted to properly instruct the jury, but the defendant—in a tactical decision—objected to the instruction. A defendant cannot object to an elements instruction, succeed on the objection, use that success to minimize the issue to

28

a jury, bolster his own credibility with the success of the objection, and then cry error and complain about the lack of an elements instruction on appeal. The invited-error doctrine prohibits us from considering the issue. Thus, we affirm.

### VII. Whether cumulative error requires reversal.

¶66. "The cumulative error doctrine provides that 'where one error, standing alone, may not warrant reversal, reversal may be required if the errors, taken together, "create such an atmosphere of bias, passion, and prejudice that they effectively deny the defendant a fundamentally fair trial."'" *Jones v. State*, 203 So. 3d 600, 617 (Miss. 2016) (quoting *Dickerson v. State*, 175 So. 3d 8, 35 (Miss. 2015) (quoting *Flowers v. State*, 158 So. 3d 1009, 1075 (Miss. 2014))). After a review of the record and the issues brought before us by Thomas and his counsel, we find that the trial court did not err. Therefore, the cumulative-error doctrine does not apply to this case.

### CONCLUSION

¶67. For the above reasons, we affirm Thomas's conviction and sentence.

¶68. **AFFIRMED.**

**WALLER, C.J., RANDOLPH, P.J., COLEMAN, MAXWELL AND BEAM, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING AND ISHEE, JJ.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶69. Because the Circuit Court of the First Judicial District of Hinds County failed to instruct the jury on the elements of the underlying felony offense of robbery, I would reverse the judgment and remand the case for a new trial. Accordingly, I respectfully dissent.

29

¶70. This Court has held that "it is always and in every case reversible error for the courts of Mississippi to deny an accused the right to have a jury decide guilt as to each and every element." *Harrell v. State*, 134 So. 3d 266, 275 (Miss. 2014). In *Harrell*, as in the present case, Harrell had been charged with capital murder and the trial court failed to instruct the jury on the underlying felony of robbery. *Id.* at 267, 269. Even though "Harrell did not bring the omission to the attention of the trial court by objecting to the State's instruction or submitting an instruction on the elements of robbery," we declined to apply a procedural bar: "The Court has rejected the application of a procedural bar when the trial court fails to instruct the jury on the elements of the underlying felony in a capital murder trial." *Harrell*, 134 So. 3d at 270 (citing *Kolberg v. State*, 829 So. 2d 29, 46 (Miss. 2002), *overruled on other grounds by Rowsey v. State*, 188 So. 3d 486 (Miss. 2016)).

¶71. This Court held that "[i]t is the trial court's responsibility to assure that the jury is 'fully and properly instructed on all issues of law relevant to the case.'" *Id.* (quoting *Kolberg*, 829 So. 2d at 46). "'There is no doubt that the trial court is ultimately responsible for rendering proper guidance to the jury via appropriately given jury instructions, even sua sponte.'" *Id.* (quoting *Kolberg*, 829 So. 2d at 45). The Court also has held "that the State is responsible for making sure the jury is instructed on the essential elements of the crime." *Harrell*, 134 So. 3d at 270 (quoting *Hunter v. State*, 684 So. 2d 625, 635 (Miss. 1996) ("[I]t is rudimentary that the jury must be instructed regarding the elements of the crime with which the defendant is charged . . . [;] even though the defendant did not present an acceptable instruction, the State was obligated to do so.")). This Court held that "the trial

30

court's failure to instruct the jury as to the elements of the underlying felony of robbery constituted reversible error." **Harrell**, 134 So. 3d at 276.

¶72. Here, the trial court gave the following instruction on capital murder, Instruction S-2B:

> The Court instructs the jury that if you believe from the evidence, beyond a reasonable doubt that:
>
> 1. the defendant, David Thomas, either alone or while acting in concert with another;
>
> 2. [d]id, on or about January 29, 2012, in the First Judicial District of Hinds County, Mississippi;
>
> 3. act in a manner which killed Fred Jackson, a human being;
>
> 4. with or without any design to effect death;
>
> 5. while engaged in the commission of robbery and without the authority of law;
>
> then, you must find the defendant, David Thomas, guilty of Capital Murder as charged in the indictment.
>
> If the prosecution has failed to prove any one or more of the above listed elements, then you shall find the Defendant not guilty of Capital Murder.

¶73. The State proposed the following jury instruction, Instruction S-3, which set forth the elements of robbery:

> The Court instructs the Jury that in order for you to find that David Thomas was engaged in the commission of the crime of robbery, you must find from the evidence in this case beyond a reasonable doubt that:
>
> 1. the defendant, David Thomas, either alone or while acting in concert with another, and [sic]
>
> 2. did, on or about January 29, 2012, in the First Judicial

31

District of Hinds County, Mississippi;

    3.      feloniously take or attempt to take the personal property of Fred Jackson, from his person or against his will;

    4.      [b]y violence to his person or by putting him in fear of some immediate injury to his person[,]

then you shall find the Defendant, David Thomas, was engaged in the commission of the crime of Robbery.

If the Prosecution has failed to prove any one or more of the above listed elements then you shall find the defendant, David Thomas, was not engaged in the commission of the crime of Robbery.

But defense counsel objected, arguing that, "in the indictment there is no charge for robbery."[9] The prosecutor agreed to withdraw Instruction S-3 and no instruction was provided the jury which listed the elements of robbery, the alleged crime underlying the capital murder charge.

¶74.    The State argues that, since Thomas admitted in his oral and written statements to police that he had participated in attacking Jackson, the elements of robbery were never at issue and the failure of the trial court to instruct the jury on the elements of robbery did not prejudice Thomas. The State continued:

No fair-minded and properly instructed jury could fail to find beyond a reasonable doubt that David Thomas, either alone or while acting in concert with another, did feloniously take or attempt to take the personal property of

---

[9] The indictment alleged that David Thomas "did willfully, unlawfully, and feloniously kill Fred Jackson, a human being, without the authority of law, with or without any design to effect death while and when engaged in the commission of the crime of Robbery . . . ." Even though the contention of the attorney was accurate, and failure to list the elements of the crime underlying the capital murder does constitute a defect in the indictment, the sufficiency of the indictment is not an issue raised on appeal, nor was it an issue raised pretrial in a demurrer or motion to quash the indictment.

Fred Jackson, from his person or against his will; by violence to his person.

To the contrary, the elements of robbery always were at issue in this case, and this Court cannot say whether the jury made such a finding without the jury's having been instructed properly on the elements of robbery. And, as in *Harrell*, which does not require a finding that the defendant's case was prejudiced, "it is *always* and in *every case* reversible error for the courts of Mississippi to deny an accused the right to have a jury decide guilt as to *each* and *every* element." *Harrell*, 134 So. 3d at 275 (emphasis added).

¶75.    The majority goes further:

> A defendant cannot object to an elements instruction, succeed on the objection, use that success to minimize the issue to a jury, bolster his own credibility with the success of the objection and then cry error and complain about the lack of an elements instruction on appeal.

Maj. Op. ¶ 65. The majority's application of the invited-error doctrine to the facts of this case upends the rule that it is "the trial court's responsibility to assure that the jury is 'fully and properly instructed on all issues of law relevant to the case.' . . . There is no doubt that the *trial court is ultimately responsible* for rendering proper guidance to the jury via appropriately given jury instructions, *even sua sponte*." *Harrell*, 134 So. 3d at 270 (quoting *Kolberg*, 829 So. 2d at 46) (emphases added). Yet the majority holds that the trial court does not have a duty "to insist on instructing the jury on the elements of the underlying felony." Maj. Op. ¶ 65. This assertion by the majority ignores established and controlling law.

¶76.    Moreover, "the State is responsible for making sure the jury is instructed on the essential elements of the crime." *Harrell*, 134 So. 3d at 270 (citing *Hunter v. State*, 684 So. 2d 625, 635 (Miss. 1996)).  The *Hunter* Court had held that "[i]t is rudimentary that the jury

33

must be instructed regarding the elements of the crime with which the defendant is charged . . . [;] even though the defendant did not present an acceptable instruction, the State *was obligated* to do so." *Harrell*, 134 So. 3d at 270 (quoting *Hunter*, 684 So. 2d at 635) (emphasis added). Here, even though the trial court's failure to do so may have been precipitated by defense counsel, it nevertheless was the trial court's responsibility and the State's responsibility to ensure that the jury was instructed correctly and fully, notwithstanding the apparent ineptitude of the defendant's lawyer.

¶77. The only way in which a jury is informed of the charge against the accused, including all the elements of the charge, is through the trial court's formal instructions to the jury. The elements of the underlying felony take on greater-than-usual importance in capital murder cases. A defendant who effects the death of another in any manner that is neither legally excusable nor justifiable can be found guilty of capital murder only if the underlying felony is proven beyond a reasonable doubt. This means that a felonious killing of another person that, without the underlying felony, might be prosecuted as manslaughter or vehicular homicide, becomes a capital offense for which a defendant can be sentenced to death or life without parole when the underlying felony is properly pled and sufficiently proven to a correctly instructed jury. Of the capital murder offenses requiring an underlying felony, as is the case here, the elements of the underlying felony become the elements of capital murder. Thus, in cases such as the one at bar, the State's obligation to prove the underlying felony is of indispensable importance.

¶78. Here, the jury had no way of knowing whether the crime of robbery had been proven

34

because it received no instruction from the court that informed it of what it takes, fact-wise, to prove robbery. Such an instruction rightly was tendered by the State; but because defense counsel foolishly objected to it and the trial judge denied the instruction to the State without requiring an appropriate substitute, the jury was left to guess about the elements of the predicate felony, without which this would not have been a capital case. It cannot be said, therefore, that Thomas was found guilty beyond a reasonable doubt of capital murder, since the jury was deprived of knowledge of all the elements of that crime.

¶79. The majority's approach, which affects not only the present case but those in the future as well, relieves Mississippi's criminal court trial judges of an enormous aspect of their responsibility as ultimate guardians of the all-important fair trial and returns us to the ways of the pre-*Newell*[10] era during the Nineteenth and Twentieth Centuries. Then, jury instructions were regarded as falling mainly within the province of the litigants and their attorneys. Judges offered little or no input, other than marking the proposed instructions *granted* or *denied*, and occasionally making pen-and-ink edits to tendered instructions, then reading the granted ones to the jury. Instructions in those days were captioned, "INSTRUCTION NO. _____ FOR THE STATE" or "INSTRUCTION NO. _____ FOR THE DEFENDANT," and began, "The Court instructs the Jury for the State. . . ." or "The Court instructs the Jury for the Defendant . . . ."

¶80. In the realm of correct jury instructions, which are essential for fair trials in which jurors are bound to follow *the instructions of the court*—not *the instructions of the*

---

[10] ***Newell v. State***, 308 So. 2d 71 (Miss. 1975).

35

*lawyers*—accurate instructions on the applicable law are indispensable to fairness. Jurors rightly regard the legal instruction they receive as coming from *the judge.* This is the only source of information jurors have respecting the law they are to follow in reaching their decisions. The jurors, the litigants, and the public have a right to believe that those instructions are correct and *complete*. They never should be provided a set of jury instructions that is incorrect or incomplete because of lawyer ineptitude that was observed but left uncorrected by a jury trial's only lawgiver, the presiding judge.

¶81. Historically, and at present, Mississippi trial jurors cannot function as such unless and until they have taken on themselves a solemn oath, which now is prescribed in the Mississippi Rules of Criminal Procedure:

> **(a) Oath of Jurors.** The court shall, on the record of each trial, give the jurors the following oath or remind the jurors that they still are under the following oath:
>
>> You, and each of you, do solemnly swear (or affirm) that you will well and truly try all issues and execute all writs of inquiry that may be submitted to you, or left to your decision by the court, or under its direction, during the present term, and true verdicts give according to the evidence. So help you God.
>
> Additionally, in each capital case, the jurors shall be sworn to "well and truly try the issue between the state and the defendant, and a true verdict give according to the evidence and the law."

M.R.Cr.P. 18.5(a).

¶82. The majority professes its solid support for the "legal tenet" articulated in **Harrell**, which, in actuality announced nothing new in its affirmation of trial judges' well-established and long-recognized responsibility to assure that the court's instructions to the jury respecting

36

the law the jurors are bound to follow is correct and complete. But a pledge of allegiance to a legal tenet that is unaccompanied by conscientious and consistent adherence to it rings rather hollow and, in reality, is without value. Struggling to absolve judges of their role in trials as the ultimate guardians of all things legal, my learned colleagues in the majority whine that trial courts, in their review of the jury instructions proposed by the parties, would have to be imbued with omniscience—a quality possessed only by Deity and unattainable for mere mortals, including trial judges—in order to do their jobs. Of course, their job descriptions include the duty to give legal instructions to jurors that, in addition to being accurate, must be complete, as is made clear by the foregoing legal tenet to which the majority claims devotion.

¶83.    The knowing and informed waivers required for valid felony guilty pleas are equated by the majority with the tacit, implied waiver ascribed to a clueless defendant whose careless lawyer fails to object to an incorrect jury instruction or unwittingly submits an insufficient one to a trial judge. This attempted analogy provides a less-than-apt comparison. That said, candor compels an acknowledgment that there are some significant similarities between the two otherwise-dissimilar kinds of waiver. Guilty pleas are conducted under the watchful eyes, attentive ears, and alert minds of judges who bear heavy responsibility for going to whatever lengths are necessary to see that all applicable constitutional and legal rights of the accused are protected. Part of the judge's job is to be sure that they are, and to correct whatever deficiencies, in the exercise of judicial diligence, he or she may detect. If deficiencies appear and cannot be rectified by judicial explanation, a recess for the accused

to confer with counsel, or other appropriate means, the judge, as the ultimate decider of the sufficiency of guilty pleas, is duty bound not to accept the plea. Similarly, the observant and conscientious Mississippi circuit court judge who actually studies the tendered instructions—which now must be filed in advance of trial under Mississippi Rule of Criminal Procedure 22(b)(1)—and finds them to be incomplete and/or incorrect is duty bound by this Court's decisions, including *Harrell* (whose tenet the majority lauds), and by the judge's oath of office, which says in part ". . . that I will faithfully and impartially discharge and perform all the duties incumbent upon me as a circuit court judge. . . ," Miss. Const. Art. 6, § 155, not to put jurors in a position of relying on, and basing their decision on, a set of incomplete and/or incorrect jury instructions. It is, indeed, the judge's job to detect and cause to be remediated whatever errors and/or omissions may exist in jury instructions. With great respect for my colleagues in the majority, for this Court to hold that, in effect, that buck stops with the lawyers and not with the judge, is grossly erroneous and sets a very perilous precedent.

¶84.    Of course, the trial judge's duty in this regard is not just to the jurors, but—and perhaps more so—to the person on trial, to the public, and to the law itself.

¶85.    Here, these duly-sworn jurors were not given judicial instructions, to which they were entitled, on all of the applicable Mississippi law they were bound to follow. Thomas was convicted of murder in the commission of a robbery by jurors who were not informed of what the State must have proven to them, beyond a reasonable doubt, for the jurors to have been justified in believing, from the evidence, that a robbery had occurred. The elements, or

38

ingredients, of robbery simply were not provided them. The majority holds that, because of attorney error, which should have been obvious to the trial judge and to the prosecutor, this glaring omission was perfectly all right. In effect, the defendant—according to the majority—is forever stuck with his attorney's blunder—a blunder the lawgiver had no duty to recognize and to correct. It is more than obvious that this case should be reversed and remanded for a new trial by a fully and correctly instructed jury.

¶86.    The majority acknowledges that the trial court's erroneous failure to instruct the jury on the elements of robbery was invited by defense counsel's actions. I agree. But the ineffectiveness of Thomas's attorney is clearly apparent from the record and alone requires reversal. *See Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Thomas's lawyer's significant failure patently prejudiced Thomas's case inasmuch as it resulted in the jury's not knowing of elements of the crime that the prosecution was obligated to prove beyond a reasonable doubt. Defense counsel's objection, that Thomas's indictment was defective for failure to list the elements of robbery, may have had some merit but was untimely. But the State's withdrawal of the objectionable jury instruction triggered the necessity of a substitute jury instruction detailing the elements of robbery. Accordingly, I would hold that defense counsel's failure to request a substitute jury instruction informing jury of the elements of the underlying felony of robbery constitutes prejudicial ineffective assistance of counsel.

    **KING AND ISHEE, JJ., JOIN THIS OPINION.**